# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DIANA PERCIVAL,

    Plaintiff,

v.                                   Case No: 8:23-cv-01243-KKM-UAM

SHERIFF CHAD CHRONISTER,
in his official capacity,
DEPUTY MARCOS PERERA,
in his individual capacity,
DEPUTY JORDAN BRIZENDINE,
in his individual capacity,
DAVID LEDUC, and
ALARM MONITORING & SERVICE,

    Defendants.

_____

## ORDER

Diana Percival sues Sheriff Chad Chronister in his official capacity and two of Chronister's deputies in their individual capacities, bringing sixteen total counts under state and federal law. *See generally* Am. Compl. (Doc. 10). The Sheriff and his deputies separately move to dismiss and also to strike Percival's claim for punitive damages. *See* Chronister MTD (Doc. 22); Deputy MTD (Doc. 25). I grant both motions in part. Defendants also move to amend the case management and scheduling order to extend certain deadlines. (Doc. 65). I grant that motion in full.

## I.   BACKGROUND

For the last thirty years, Percival has lived at 7001 Applewood Court in Tampa, Florida. Am. Compl. ¶ 13. For some portion of that time, Percival dated David Leduc. *Id.* ¶ 14. Leduc had his own home, never lived at 7001 Applewood Court, and never possessed a key to the home. *Id.* ¶¶ 14, 27. Sometime in May 2020, Percival and Leduc ended their relationship. *Id.* ¶ 15. Several weeks later, Leduc claimed to have left some of his belongings at Percival's home and so reached out to the Hillsborough County Sheriff's Office to help him retrieve them. *Id.* ¶¶ 13, 15.

On June 2, 2020, Leduc arrived at 7001 Applewood Court, where Percival was home alone. *Id.* ¶ 16. Soon after, Deputy Marcos Perera also arrived. *Id.* ¶ 17. Leduc rang the doorbell and Percival answered the door. *Id.* ¶¶ 18–19. Perera approached and explained to Percival that Leduc "was there to enter 'his residence' to 'get his stuff' from inside." *Id.* ¶¶ 20–21. Leduc, Perera said, had told the deputy that he lived in the home. *Id.* ¶ 22. Still standing in the doorway, Percival explained to Perera that Leduc had lied— he did not live (and had never lived) at her home. *Id.* ¶¶ 22–23. Percival repeatedly pleaded with Perera to check Leduc's driver's license, which she explained would verify her story about Leduc's actual residence, but Perera declined to conduct any further investigation into the veracity of Leduc's claims. *Id.* ¶¶ 24–26.

Leduc and Perera did not leave, instead they continued to demand that Percival allow them to enter the home. *Id.* ¶ 28. Percival allowed Leduc to enter "to try to talk to [him] in private and defuse the situation" but she never invited Perera inside. *Id.* ¶ 29. When Leduc walked into the home to talk to Percival, though, Perera followed. *Id.* ¶ 30. Once inside, Leduc "immediately began to rummage through [Percival's] belongings." *Id.* ¶ 31. Upset, Percival "screamed" that "Leduc and Perera [should] leave" and reiterated that Leduc did not live at the home. *Id.* ¶ 32. She also asked Perera whether he had a warrant, which Perera denied that he needed "because [Perera] was there with Leduc to enter '[Leduc's] residence to get [Leduc's] stuff.' " *Id.* ¶¶ 33–34. Perera and Leduc then exited the home. *Id.* ¶ 35.

After the two men went back outside, Percival told Leduc that "she did not want [him] in her home," told Perera that he "needed to obtain a warrant before re-entering," and shut the front door. *Id.* ¶ 36. Leduc and Perera talked for a few minutes and then approached the door again. *Id.* ¶ 37. Despite Percival's continued demands that he leave, Leduc tried to force his way into the home. *Id.* ¶ 38. Percival opened the door and asked Leduc to stop, at which point Leduc stood in the doorway to block it with his body. *Id.* ¶¶ 39–40. Perera stood by and watched, which made Percival afraid that the deputy was acting on Leduc's orders. *Id.* ¶¶ 41–42. Although Percival was eventually able to shut and lock the door, Perera and Leduc did not leave. *Id.* ¶¶ 43–44.

3

A second deputy, Jordan Brizendine, eventually arrived at the home and went to speak with Perera. *Id.* ¶¶ 47–48. After talking, the three men walked to the front door and "demanded that [Percival] let them inside." *Id.* ¶¶ 49–50. Brizendine told Percival that Leduc would be going inside to retrieve his belongings and Percival reiterated that Leduc did not live at the home. *Id.* ¶¶ 51–52. Just as she had done before with Perera, Percival told Brizendine that he could confirm the truth of her assertions by checking Leduc's driver's license. *Id.* ¶ 53. But like Perera, Brizendine refused to investigate. *Id.*

Rather than investigate Leduc's claim that he was Percival's co-tenant, Brizendine instructed Leduc to kick the door in. *Id.* ¶ 54. When Leduc suggested that he could use a drill on the lock instead, Brizendine instructed Leduc to go retrieve the drill. *Id.* ¶¶ 54–55. Percival told Brizendine that she was concerned Brizendine was "encouraging Leduc to destroy her property and break into her home." *Id.* ¶ 56. As Leduc approached the door with the drill, Percival—afraid that the three men would force their way into the home— once again opened the door to beg everyone to leave. *Id.* ¶¶ 57–58. Leduc then "pushed the door wide open" and rushed through into the home. *Id.* ¶ 59. Despite lacking either a warrant or an invitation, Perera and Brizendine followed suit. *Id.* ¶¶ 60–62.

Once everyone was in the home Percival again yelled at the deputies: asking where their warrant was, explaining that Leduc did not have a key to the home, and requesting that the three men leave. *Id.* ¶¶ 63–64. She tried to retreat up the stairs but was blocked

by Brizendine, eventually making her way down a different stairway as Leduc and the deputies followed. *Id.* ¶¶ 66–67. There, Brizendine restrained Percival—one hand on her and the other hand on his gun—as Perera stood next to Leduc, who was gathering items including Percival's checkbook, credit cards, bills, and a few of Leduc's personal belongings. *Id.* ¶¶ 68–70. When Leduc began to take some of her things, Percival entreated the deputies not to let Leduc take her possessions and "reached for her checkbook to prevent Leduc from taking it." *Id.* ¶¶ 71–72. "Brizendine grabbed [Percival] from behind, held her arms down to her sides[,] and pressed his chest into her back." *Id.* ¶ 73. Brizendine would not release Percival until Leduc told him that the checkbook belonged to her. *Id.* ¶ 75.

Very much afraid for her safety, Percival dialed 911 to try to reach other officers who might protect her from Leduc and the deputies. *Id.* ¶¶ 76–79. Meanwhile, Leduc kept packing items into a box before eventually leaving with it. *Id.* ¶¶ 80–82. The deputies, though, did not leave with Leduc. *Id.* ¶ 84. Instead, Perera stood by the front door and Brizendine waited for Percival at the top of the stairs. *Id.* When Percival walked back up the stairs to the main floor of her home, the deputies boxed her into the dining room. *Id.* ¶¶ 85–87. Percival again asked the deputies to leave, explaining that Leduc appeared to have gotten what he had come for and left. *Id.* ¶¶ 89–90. Brizendine shouted twice at Percival to shut up, *id.* ¶¶ 91, 93, and then the deputies signaled to one another before charging at Percival across the room, *id.* ¶¶ 94–96.

Brizendine hit Percival first—knocking her leg out from under her, pushing her to the ground, placing both knees on her shoulder, and applying his full bodyweight to pin Percival in place. *Id.* ¶ 97. Perera joined in, pressing a foot down on Percival's lower spine. *Id.* ¶ 98. "Brizendine pushed [Percival] so hard" that her "forehead hit the ceramic floor[ing]." *Id.* ¶ 99. Percival told the deputies that she had done nothing wrong, that they were in her home illegally, that she couldn't breathe, and that they were going to kill her. *Id.* ¶ 100. But the more she screamed, "the more pain and pressure [the deputies] applied." *Id.* ¶¶ 101–03. Eventually Percival became disoriented and lost consciousness, coming to in handcuffs. *Id.* ¶¶ 104–06. Upon regaining consciousness, she told Brizendine that she believed he had broken her arm and shoulder. *Id.* ¶ 107. Percival was taken to jail and charged with domestic violence battery, resisting an officer without violence, and misuse of the 911 system. *Id.* ¶ 108. After she arrived at the jail, "Percival realized that she [was] bleeding from her rectum." *Id.* ¶ 109.

Percival spent a night in jail before being released on a $600 bond the next day. *Id.* ¶ 118. About five months later, prosecutors dropped the charges. *Id.* ¶ 125. Because of the arrest, Percival's employer suspended her without pay for three months and demoted her when she returned. *Id.* ¶ 124. Physically, Percival "suffers from severe pain along the right side of her body, concentrated on her right neck, shoulder, and hip." *Id.* ¶ 119. She also "loses feeling in her right leg if she sits for an extended period." *Id.* Mentally, "Percival has

experienced continuous difficulties with feeling safe and sleeping in her own home" and lives "in constant fear of another invasion and brutal physical attack by law enforcement officials." *Id.* ¶¶ 120–21. Her doctors have prescribed daily pain medication as well as medication to treat panic and anxiety attacks. *Id.* ¶¶ 122–23.

Three years to the day after her arrest, Percival sued in federal court naming the Sheriff, the deputies, Hillsborough County, Leduc, and Alarm Monitoring & Service, Inc., as defendants. Compl. (Doc. 1). After she amended her complaint to drop the County, *see* Am. Compl., the Sheriff and his deputies separately moved to dismiss. *See* Chronister MTD; Deputy MTD.

## II.   LEGAL STANDARDS

### A. Rule 12(b)(6) Motions to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it

tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss" for failure to state a claim, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering the motion, the Court accepts the complaint's factual allegations as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004), *abrogated on other grounds by Twombly*, 550 U.S. at 544.

## B. Rule 12(f) Motions to Strike

Rule 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). But "it is well settled among courts in this circuit that motions to strike are generally disfavored and will usually be denied unless it is clear the pleading sought to be stricken is insufficient as a matter of law." *Blanc v. Safetouch, Inc.*, No. 07-cv-1200, 2008 WL 4059786, at *1 (M.D. Fla. Aug. 27, 2008) (collecting cases); *see also Belmer v. Ezpawn*

8

*Fla., Inc.*, No. 20-cv-1470, 2020 WL 7419663, at *1 (M.D. Fla. Sept. 28, 2020) (noting that courts have "broad discretion" to rule on a motion to strike but emphasizing that such motions are "drastic" and are often considered "time wasters" (quotation omitted)).

A pleading is "insufficient as a matter of law" only if (1) it is patently frivolous on its face or (2) it is clearly invalid as a matter of law. *Belmer*, 2020 WL 7419663, at *1. This Court "will not exercise its discretion under the rule to strike a pleading unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995).

## C. Qualified Immunity in Individual Capacity Officer Suits

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). To be entitled to qualified immunity, a government official must first prove that he was acting within his discretionary authority at the time of the alleged violation. *See Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). After a defendant meets this initial burden, the plaintiff must show that (1) the official violated her constitutional or statutory rights and (2) those rights were clearly established at the time the official acted. *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir.

2017). "When qualified immunity is asserted in the context of a motion to dismiss, [courts] look to the pleadings to see if the plaintiff has successfully alleged the violation of a clearly established right." *O'Rourke v. Hayes*, 378 F.3d 1201, 1206 (11th Cir. 2004).

"For a constitutional right to be 'clearly established' the 'contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.' " *Bates v. Harvey*, 518 F.3d 1233, 1247–48 (11th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Eleventh Circuit has "identified three ways in which the law can give an officer 'fair and clear notice' that his conduct is unconstitutional." *Id.* at 1248. "First, the constitutional provision in question will be specific enough to establish clearly the law applicable to particular conduct and circumstances." *Id.* (quotations omitted). "Where, however, the conduct is not so egregious as to violate [the Constitution] on its face, [courts] then turn to case law." *Id.* (emphases, quotations, and footnote omitted). "Under this second method . . . a broad principle found in the case law can establish clearly the law applicable to a specific set of facts facing a government official when the principle is set forth with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know" that his conduct violated the Constitution. *Id.* (quotations omitted). Finally, "if [there is] no case law with a broad holding . . . that is not tied to particularized facts, [courts] then look at precedent that is tied to the facts." *Id.* (emphases and quotations omitted). "Because

[the] clearly established inquiry centers on objective reasonableness, [courts] have to examine how a reasonable officer in [the defendant's position at the time of the challenged conduct] would have interpreted and responded to [events] in light of then-clearly established law." *Id.* at 1249.

## III. ANALYSIS

Each challenged count in the amended complaint names either the Sheriff or his deputies but never both. Therefore, I address the Sheriff's and the deputies' separate motions to dismiss in turn.

### A. Percival's Claims Against the Sheriff

Counts IX, XI, XIII, and XV of the amended complaint all allege state law claims against the Sheriff in his official capacity. *See* Am. Compl. ¶¶ 176–80 (Count IX—Battery); *id.* ¶¶ 188–95 (Count XI—Trespass); *id.* ¶¶ 203–07 (Count XIII—False Arrest); *id.* ¶¶ 214–19 (Count XV—Illegal Search of Home). I begin by discussing the Sheriff's argument that he is immune from suit because Percival failed to allege compliance with Florida's pre-suit notice requirement, which applies to all four counts. *See* Chronister MTD at 23.

### 1. Percival Failed to Allege Compliance with Florida's Pre-Suit Notice Requirement

The Florida Statute governing whether a Sheriff sued in his official capacity is immune from suit provides that:

> [a]n action may not be instituted on a claim against the [S]tate or one of its agencies or subdivisions unless the claimant presents the claim in writing to the appropriate agency, and also, except as to any claim against a municipality, county, or the Florida Space Authority, presents such claim in writing to the Department of Financial Services, within 3 years after such claim accrues and the Department of Financial Services or the appropriate agency denies the claim in writing.

§ 768.28(6)(a), FLA. STAT. These pre-suit notice requirements "are conditions precedent to maintaining an action," *id.* § 768.28(6)(b), and "statutory waiver[s] of sovereign immunity, [that] must be strictly construed," *Levine v. Dade Cnty. Sch. Bd.*, 442 So. 2d 210, 212 (Fla. 1983).

The Sheriff argues that Counts IX, XI, XIII, and XV should be dismissed as to him for failure to plead compliance with § 768.28(6). Chronister MTD at 23. Percival concedes that she "has not expressly alleged that she complied with [§ 768.28(6)]" but urges forgiveness for this failure because she "has in fact complied with said requirements." Resp. (Doc. 36) at 29; *see also* (Docs. 37-1) (email dated June 2, 2021, at 11:06 AM, which appears to be addressed to the Sheriff and contain an attached "§ 768.28 Notice Letter").

Percival's argument amounts to an effort to amend the complaint in response to the Sheriff's motion to dismiss. But a motion for leave to amend, not a responsive filing, is the appropriate procedural vehicle for a plaintiff to alter the allegations in her complaint. *See Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the

issue has not been raised properly."). Percival's attempt at an implicit amendment also concerns more than a trivial detail. Compliance with § 768.28(6) determines whether Florida has waived its sovereign immunity. Statutory sovereign immunity waivers are narrowly construed and strictly enforced, as they must be to defend the States' sovereign prerogative to determine when and how to subject themselves to suit. *See Levine*, 442 So. at 212 (Section 768.28(6) "must be strictly construed"); *cf. Austin v. Glynn Cnty.*, 80 F.4th 1342, 1351 (11th Cir. 2023) ("A state's waiver of sovereign immunity is neither horseshoes nor hand grenades—'close enough' is 'not enough.' "). And it is irrelevant that Percival claims that she complied with § 768.28(6). Florida courts are clear on this point: "Under § 768.28(6), not only must the notice be given before a suit may be maintained, but also the complaint must contain an allegation of such notice." *Levine*, 442 So. 2d at 213; *see also Comm. Carrier Corp. v. Indian River Cnty.*, 371 So. 2d 1010, 1022–23 (Fla. 1979) (same).

That leaves only the remedy. When a complaint fails to allege compliance with § 768.28(6) but the possibility of demonstrating compliance remains an option, courts should dismiss with leave to amend. *See Comm. Carrier Corp.*, 371 So. 2d at 1023 (explaining that "failure of the pleadings [to allege compliance with § 768.28(6)] does not call for dismissal with prejudice[,] . . . the third-party complaint in each case should have been dismissed with leave to amend"); *Albra v. City of Ft. Lauderdale*, 232 F. App'x 885,

888 (11th Cir. 2007) (per curiam) (same remedy). Thus, Percival's claims against the Sheriff are dismissed without prejudice subject to a limited grant of leave to amend.[1]

### 2. Count IX: Battery

Under Florida law, "battery has two elements: (1) inten[t] to cause a harmful or offensive contact, and (2) a resulting offensive contact with the person of the other." *Baxter v. Roberts*, 54 F.4th 1241, 1272 (11th Cir. 2022) (quotations omitted). Count IX alleges that the deputies "caused bodily harm to [Percival] by kicking her, slamming her to the ground, and pinning her to the ground with the full force and weight of their bodies on [her] frame." Am. Compl. ¶ 177. The Sheriff first argues that Count IX should be dismissed with prejudice because it merges into Count XIII, Percival's state law false arrest claim. Chronister MTD at 8–9. At the pleading stage, I disagree.

The general rule under Florida law is that a battery claim "based upon the officer's placing of the [plaintiff] in physical custody" will merge into a parallel claim for false arrest because the alleged battery is "no more than [an] ordinary incident[] of the arrest, which do[es] not give rise to an independent tort." *Lester v. City of Tavares*, 603 So. 2d 18, 19–

---

[1] Although the remedy for her pleading failure is dismissal without prejudice and the grant of limited leave to amend, Percival should remain aware that she must demonstrate that she has in fact satisfied § 768.28(6)'s notice requirement. It is not clear that the proffer of an unsworn email, without more, would suffice. *See Simmons v. Pub. Health Tr. Miami-Dade Cnty.*, 338 So. 3d 1057, 1065 (Fla. 3d DCA 2022) (explaining that because "the mailbox rule does not apply in the context of sovereign immunity cases" plaintiffs are "required to show that [their] notice of claim . . . was received, in hand, by [the relevant agency before the relevant deadline]"). "Where the time for such notice has expired so that it is apparent that the plaintiff cannot fulfill the requirement, the trial court has no alternative but to dismiss the complaint with prejudice." *Levine*, 442 So. 2d at 213.

20 (Fla. 5th DCA 1992); *see also Baxter*, 54 F.4th at 1273 (applying *Lester*). There are two exceptions to the merger rule: (1) when "the battery occurred before the arrest," *see Harris v. Miami-Dade Cnty. Dept. of Corr. & Rehab.*, 160 F. App'x 814, 816–17 (11th Cir. 2005) (per curiam), and (2) "[i]f excessive force is used in an arrest." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). The second exception applies "only where the force used is clearly excessive." *Id.*

The amended complaint alleges that the deputies battered Percival by "kicking her, slamming her to the ground, and pinning her to the ground with the full force and weight of their bodies." Am. Compl. ¶ 177. Whether this incident merges into Percival's false arrest claim is a close question. On the one hand, Percival describes the incident as a "takedown," *id.* ¶ 84, claims that the deputies "made a signal to each other that was obvious and apparent" before initiating contact, *id.* ¶ 94, and explains that she was placed in handcuffs during the incident rather than later on, *id.* ¶¶ 96–105. Even taken as true and interpreted in the light most favorable to Percival, these facts tend to show that the "takedown" directly brought about Percival's arrest. On the other hand, Percival frames the incident as an excessive use of force elsewhere in the amended complaint, *see id.* ¶ 172 (parallel battery claim against the deputies alleging that they "used excessive and unreasonable force to kick and sweep [Percival] to the ground, and used their bodies, feet, and knees to pin [her] against the ground"), ¶¶ 138–43 (excessive force claim against the

deputies), and the facts are not drastically different from those in *Harris*, *see* 160 F. App'x at 816–17.

On balance, and viewing the allegations in the amended complaint in the light most favorable to Percival, I cannot conclude that the facts alleged—the deputies performed a "takedown" that pinned Percival to the ground, caused her to hit her head and momentarily lose consciousness, and ended with her being handcuffed—are not either clearly excessive force relative to the needs of the arrest, *see Baxter*, 54 F.4th at 1273 (battery merged into false arrest because "grabbing [an arrestee], forcing him to the ground, and pulling his arm up" was "entirely ordinary" and "necessary to subdue a resisting suspect"), or a battery separate from the arrest, *see Harris*, 160 F. App'x at 817. At the pleading stage, Percival's battery claim does not merge.

The Sheriff also contends, even if the alleged battery does not merge, that he is immune from suit under § 768.28(9)(a), Florida Statutes, because a reasonable jury could conclude that the deputies "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *See* Chronister MTD at 5–11. The argument appears to be that because a reasonable jury could find that the statutory trigger authorizing an action against the deputies in their individual capacities was met, no parallel action can proceed against the Sheriff in his official capacity. Not so.

To be sure, a judgment against the deputies in their individual capacities would ultimately preclude a judgment against the Sheriff in his official capacity on the same claim. But Percival is allowed to plead her claims in the alternative. *See* FED. R. CIV. P. 8(a)(3), (d)(2)–(3); *Gregory v. Miami-Dade Cnty.*, 719 F. App'x 859, 873 (11th Cir. 2017) (per curiam). And although there may be rare situations when "no version of the facts pled in [the complaint] support a claim that [law enforcement officers] acted without wanton and willful disregard of [the plaintiff's] rights," *Gregory*, 719 F. App'x at 874, this case is not one of them. The deputies may well have been wrong to use the force alleged to execute Percival's arrest. Indeed, doing so may prove to have been an excessive use of force. But executing a "takedown" on these facts is not so beyond the pale as to require a jury to find that the deputies acted out of "bad faith," "malicious purpose," or "wanton and willful disregard of human rights, safety, or property." § 768.028(9)(a), FLA. STAT.

### 3. Count XI: Trespass

"Trespass to real property is the unauthorized entry onto another's real property." *Daniel v. Morris*, 181 So. 3d 1195, 1199 (Fla. 5th DCA 2015). Count XI alleges that the deputies "trespassed by entering [Percival's] home without consent or legal authority." Am. Compl. ¶ 189. Percival claims that, despite explaining (1) Leduc had never lived at 7001 Applewood Court, (2) Leduc did not have a key to the home, and (3) a quick look at Leduc's driver's license would confirm Percival's version of events, the deputies entered her

home without permission based on uncritical acceptance of Leduc's story. *See id.* ¶¶ 16–62. The Sheriff argues that Percival's trespass claim[2] fails for three reasons. Chronister MTD at 11–15. First, Percival has not articulated actual damages. *Id.* at 11–12. Second, the deputies reasonably believed Leduc lived at Percival's home and had invited them in. *Id.* at 12–14. And third, the Sheriff is immune from suit under § 768.28(9)(a). *Id.* at 14–15. I disagree on all three points.

The Sheriff's damages argument fails because Percival need not allege actual damages to prevail on a civil trespass claim. *See Daniel*, 181 So. 3d at 1199 (trespass plaintiffs entitled to nominal damages "[e]ven if no actual damages are proven").

The consent argument fares no better. "Consent is an absolute defense to an action for trespass." *Pearson v. Ford Motor Co.*, 694 So. 2d 61, 69 (Fla. 1st DCA 1997). "Generally, the existence of an affirmative defense will not support a motion to dismiss. [But] [i]n some cases . . . [a] complaint may be dismissed if an affirmative defense . . . appears on the face of the complaint." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1225 n.8 (11th Cir. 2016) (citations and quotations omitted). For the Sheriff to prevail, the amended complaint must allege facts, taken as true and construed in Percival's favor, that show the deputies possessed valid consent to enter the home.

---

[2] The Sheriff also notes that Percival's "[a]llegations appear to implicate a criminal trespass under" § 810.08, Florida Statutes. Chronister MTD at 11 n.7. So far as Percival alleges a crime was committed under § 810.08, she does not state a claim for civil liability based on criminal conduct.

The Sheriff relies on decisions interpreting the Fourth Amendment of the United States Constitution to articulate the standard for consent to entry by a law enforcement officer in a Florida civil trespass claim. *See* Chronister MTD at 12–14. Percival responds in kind. *See* Resp. at 24–26. Because the Parties have not briefed whether any different standard applies under Florida civil law, I assume without deciding that these Fourth Amendment principles are informative to determine consent in the state law tort context under the factual scenario alleged in the amended complaint.

In Fourth Amendment cases, consent may be obtained "either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations and quotations omitted). "Common authority is . . . not to be implied from the mere property interest a third party has in the property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes . . . ." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). Because Percival repeatedly and vocally denied the deputies permission to enter, Leduc is the only potential source of consent. And because Percival alleges that Leduc never lived at the residence, *see* Am. Compl. ¶ 14, he lacked common authority as a matter of fact. Factually deficient consent can still be valid, though, if law enforcement "reasonably (though erroneously) believe[s] that the person who has consented to their entry is a resident of the premises." *Rodriguez*, 497 U.S. at 186. This

19

zone of reasonable belief is not unlimited: "Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Id.* at 188. In sum, the "determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Id.* at 188 (cleaned up).

I cannot conclude that the affirmative defense of consent appears on the face of the amended complaint. Like many other Fourth Amendment questions, determining whether a law enforcement official reasonably relied on the consent of a third-party who lacked common authority requires a fine-grained factual analysis. *See id.* Taking Percival's allegations as true and construing the facts in her favor, I cannot say at the pleading stage that—despite Leduc's "explicit assertion" that he lived in Percival's home—"the surrounding circumstances" (including Percival's statements that Leduc was lying and that he had never lived at or had a key to the home, as well as Percival's repeated pleas that the deputies could refute Leduc's story by briefly reviewing his driver's license) were not such that a reasonable person would either doubt Leduc's story or conduct further investigation before relying on it.

Finally, the Sheriff contends that he is immune from suit under § 768.28(9)(a). *See* Chronister MTD at 14–15. For the reasons I rejected that argument with respect to Count IX, I also reject it here. It may turn out that the deputies' acceptance of Leduc's claims was objectively unreasonable, but it was not so egregious as to require a finding of "bad faith," "malicious purpose," or "wanton and willful disregard of human rights, safety, or property." § 768.028(9)(a), FLA. STAT.; *see also Gregory*, 719 F. App'x at 873–74.

### 4. Count XIII: False Imprisonment/False Arrest

Under Florida law, "[f]alse arrest and false imprisonment are different labels for the same cause of action." *Weissman v. K-Mart Corp.*, 396 So. 2d 1164, 1165 n.1 (Fla. 3d DCA 1981). To state a claim, Percival must allege (1) an intent to confine, (2) an act resulting in confinement, and (3) her awareness of such confinement or resulting harm. *See Cannon v. Macon Cnty.*, 1 F.3d 1558, 1562 n.3 (11th Cir. 1993). The existence of probable cause is an affirmative defense under Florida law. *Ford v. Boynton Beach*, 323 So. 3d 215, 219 (Fla. 4th DCA 2021). Count XIII alleges that the deputies "subjected [Percival] to an unlawful detention and deprivation of liberty," "unreasonably restrained [her] to the inside of her home against her will," and then "went a step further and formally arrested [her]." Am. Compl. ¶¶ 203–05. Percival claims that, after Leduc left with his belongings, the deputies took up positions by the front door and in the living room that "restricted [her] to [the] dining room area." *Id.* ¶¶ 86–87. The Sheriff contends that Count

XIII fails because the deputies' actions were justified given Percival's conduct and that he is immune under § 768.28(9)(a). Chronister MTD at 15–19. I disagree on both points.

I understand the Sheriff's first argument to suggest that the amended complaint demonstrates the deputies had probable cause to arrest Percival based on her actions, which included refusing Leduc and the deputies' entry to the home, running around the home and yelling at Leduc and the deputies to leave, calling 911 in an effort to have other law enforcement officers respond to the ongoing altercation and keep her safe, reaching for her checkbook to stop Leduc from taking it, and refusing to "shut up" after being directed to do so. *See* Chronister MTD at 16–17. Taking these allegations as true and construing them in Percival's favor, I cannot say that the deputies had probable cause to arrest Percival for any crime. Seemingly recognizing this difficulty, the Sheriff asks me to take judicial notice of Percival's criminal proceeding and to rely on another court's probable cause determination. *Id.* at 17. But I cannot replace the facts alleged in the amended complaint with those found in Percival's criminal case when deciding a motion to dismiss. *See Iqbal*, 556 U.S. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). Thus, at the pleading stage, the Sheriff's probable cause argument fails.

The Sheriff's argument that he is immune under § 768.28(9)(a) fails for the same reason it did with respect to Counts IX and XI—Percival is allowed to plead her claims in

the alternative and the allegations in the amended complaint do not conclusively demonstrate "bad faith," "malicious purpose," or "wanton and willful disregard of human rights, safety, or property." § 768.028(9)(a), Fla. Stat; *see also Gregory*, 719 F. App'x at 873–74.

### 5. Count XV: State Law Illegal Search of Home

Count XV alleges that the deputies illegally entered Percival's home "absent a warrant, probable cause, or consent," thus violating her rights under the Florida Constitution. Am. Compl. ¶¶ 215–16. In response, the Sheriff largely repeats the consent and § 768.28(9)(a) arguments that I have already rejected when discussing earlier counts. Chronister MTD at 19–23. For the reasons I explained when discussing Counts XI and XIII, neither argument is appropriate to resolve at the pleading stage.

The Sheriff also raises two new related arguments—that Percival "does not actually allege the deputies conducted any search inside [her residence]" and that Count XV merges into Count XI, a parallel state law trespass claim. Chronister MTD at 21. Although the amended complaint is poorly phrased and incorrectly grounds Count XV in the Florida Constitution, the only plausible interpretation of that count is that Percival alleges the deputies invaded the privacy of her home. *See* Resp. at 28 (citing *Guin v. City of Riviera Beach*, 388 So. 2d 604 (Fla. 4th DCA 1980)). Florida courts have recognized a common law invasion of privacy tort and held that it can, at least sometimes, be successfully pleaded

parallel with trespass. *See Guin*, 388 So. 2d at 606. The distinction between the two torts is that "merely entering a building constitutes a trespass," unlike invasion of privacy—"which [in relevant part] consists of 'intrusion upon the plaintiff's physical solitude or seclusion, as by invading [her] home.' " *Id.* (quoting W. PROSSER, TORTS § 117, P. 807 (4th ed. 1971)).

The amended complaint alleges that the deputies accompanied Leduc throughout Percival's home as he "rummage[d] through [her] belongings," Am. Compl. ¶ 31, "followed Percival downstairs" and then "stood by Leduc" as he "gathered some items placed on the top of [Percival's] desk" including "[her] checkbook, credit cards, and bills," *id.* ¶¶ 67, 69–70. Given these facts, that the deputies are not alleged to have conducted a formal search does not defeat a claim for invasion of privacy, at least at the pleading stage. Count XV states a claim for common law invasion of privacy that does not merge into Count XI.

### B. Percival's Claims Against the Deputies

The amended complaint includes twelve counts against the deputies in their individual capacities. Am. Compl. ¶¶ 126–31 (Count I, § 1983—Unconstitutional Entry); *id.* ¶¶ 132–37 (Count II, § 1983—False Imprisonment); *id.* ¶¶ 138–43 (Count III, § 1983—Excessive Force); *id.* ¶¶ 144–49 (Count IV, § 1983—False Arrest); *id.* ¶¶ 150–54 (Count V, § 1983—Illegal Search of Home); *id.* ¶¶ 155–62 (Count VI,

§ 1983—Malicious Prosecution); *id.* ¶¶ 163–70 (Count VII, State Law—Malicious Prosecution); *id.* ¶¶ 171–75 (Count VIII, State Law—Battery); *id.* ¶¶ 181–87 (Count X, State Law—Trespass); *id.* ¶¶ 196–202 (Count XII, State Law—False Imprisonment/Arrest); *id.* ¶¶ 208–13 (Count XI, State Law—Illegal Search of Home); *id.* ¶¶ 220–25 (Count XVI, State Law—Intentional Infliction of Emotional Distress). The deputies move to dismiss and to strike Percival's request for punitive damages. *See* Deputy MTD.

### 1.  Count I: § 1983—Unconstitutional Entry

Count I alleges that the deputies violated Percival's Fourth Amendment rights by entering her home "against her will and without a warrant or a warrant exception." *See* Am. Compl. ¶ 127. The deputies argue that Count I should be dismissed because they could not have violated the Fourth Amendment given Leduc's invitation. Deputy MTD at 5–7. They also argue that they are entitled to qualified immunity. *Id.* at 7–8.

The deputies' consent argument is identical to the Sheriff's and fails for the same reason. Taking the allegations in the amended complaint as true and construing the facts in the light most favorable to Percival, I cannot say that the face of the complaint demonstrates valid consent.

The deputies' qualified immunity argument fares no better. Because discretionary function is undisputed and I have already discussed consent at length, "clearly established

law" is all that remains. Percival correctly points out that the Supreme Court has examined a very similar factual scenario to this one. *See* Resp. at 9; *Georgia v. Randolph*, 547 U.S. 103 (2006). There, the Supreme Court considered whether a co-tenant wife's grant of consent to search her marital home was valid against her husband, who strenuously and contemporaneously objected. *Randolph*, 547 U.S. at 107. The Supreme Court concluded that "[s]ince the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.* at 114. Thus, "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search." *Id.* at 121.

*Randolph* was decided well before June 2, 2020, and is directly on point. Even assuming it was not clearly established that the deputies should have more thoroughly investigated Leduc's claimed co-tenancy under the circumstances, Leduc's consent could not have overcome Percival's repeated and contemporaneous objections, made from the front door, regardless. Thus, the deputies were on notice that relying on Leduc's consent to justify warrantless entry in the face of Percival's objection violated the Fourth Amendment.

## 2.  Count II: § 1983—False Imprisonment

To state a claim for false imprisonment under § 1983, Percival "must meet the elements of common law false imprisonment [(1) intent to confine, (2) acts resulting in confinement, and (3) consciousness of the victim of confinement or resulting harm] and establish that the imprisonment resulted in a violation of due process rights under the Fourteenth Amendment." *Ortega v. Christian*, 85 F.3d 1521, 1526 & n.2 (11th Cir. 1996). "[I]n order to establish a due process violation, a plaintiff must show that the officer acted with deliberate indifference, i.e., demonstrating that the officer 'had subjective knowledge of a risk of serious harm and disregarded that risk by actions beyond mere negligence.' " *Helm v. Rainbow City*, 989 F.3d 1265 (11th Cir. 2021) (quoting *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009)). "If an officer has arguable probable cause to seize an individual, that finding may defeat a claim of deliberate indifference" on qualified immunity grounds. *Id.* The deputies contend that Percival has failed to state a claim for false imprisonment under § 1983 and assert qualified immunity. Deputy MTD at 8–10. At the pleading stage, I disagree on both points.

First, although certainly not well pleaded, the amended complaint alleges that Percival spent a night in jail following her arrest before being released on bond the next day. *See* Am. Compl. ¶¶ 108, 118. "Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under [§ 1983] for false imprisonment based on a

27

detention pursuant to that arrest." *Ortega*, 85 F.3d at 1526. And for the same reasons I rejected the Sheriff's probable cause argument in Count XIII above, the deputies' similar argument fails as to actual probable cause.

Second, to establish qualified immunity for a false arrest or false imprisonment claim, "an officer need not have actual probable cause, but only arguable probable cause." *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (quotations omitted). "An officer has *arguable* probable cause if 'a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests.' " *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 68 (2018)). In other words, "[a]n officer lacks arguable probable cause only if 'the state of the law on the date of the alleged misconduct makes it obvious that the [officer's] acts violated the plaintiff's rights in the specific set of circumstances at issue.' " *Id.* (quoting *Washington v. Howard*, 25 F.4th 891, 903 (11th Cir. 2022)). " '[T]he dispositive question is whether it was already clearly established, as a matter of law, that at the time of Plaintiff's arrest [and subsequent imprisonment in a false imprisonment case], an objective officer could not have concluded reasonably that probable cause existed to arrest Plaintiff under the particular circumstances Defendants confronted.' " *Id.* (quoting *Gates v. Khokhar*, 884 F.3d 1290, 1303 (11th Cir. 2018)).

There are three methods by which a plaintiff can show the lack of arguable probable cause: (1) "because an existing precedent establishes that there was no actual probable cause for an arrest on similar facts," (2) "because the text of an applicable statute plainly precludes [the officer] from making an arrest under that statute," and (3) because "the officer [was] so lacking in evidence to support probable cause that the arrest was obviously unconstitutional." *Id.* at 1187. Under all three methods, "[w]hether an officer possesses probable cause or arguable probable cause to arrest depends on the elements of the alleged crime and the operative facts." *Hardigree v. Lofton*, 992 F.3d 1216, 1230 (11th Cir. 2021). The overall effect is that "[u]nless the law makes it obvious that the officer's acts violated the plaintiff's rights, the officer has qualified immunity." *Garcia*, 75 F.4th at 1187 (cleaned up).

The deputies make no real argument on arguable probable cause, contending only that "[i]t was not clearly established that the circumstances alleged . . . including the totality of [Percival's] actions, the [d]eputies' duty to protect Leduc, and [Percival's] lack of compliance" added up to a constitutional violation. Deputy MTD at 9–10. But taking the facts alleged in the amended complaint as true, the deputies' recitation is not what happened on the day of the arrest. The amended complaint alleges that, rather than exhibiting "noncompliance" with lawful orders, Percival merely attempted to prevent unlawful entry into her home. *See generally* Am. Compl. ¶¶ 16–96. The deputies' claimed

29

duty to protect Leduc, who is alleged to have left the house before Percival was arrested and then taken to jail, is also out of the picture. *See id.* ¶¶ 80–83. This leaves "the totality of [Percival's] actions," which are alleged to have been limited to telling the deputies and Leduc to leave, preventing Leduc from taking her checkbook, running around the house, and calling 911 in the hope that additional law enforcement officers would protect her from Leduc and the deputies. Viewing these facts in the light most favorable to Percival, she has adequately pleaded the absence of even arguable probable cause.

### 3. Count III: § 1983—Use of Excessive Force

Count III alleges that the deputies "intentionally and aggressively grabbed [Percival], swept her feet from under her, slammed her to the floor and dropped all their body weight onto [her]." Am. Compl. ¶ 139. Percival claims this force was excessive given that she "was not resisting and did not pose any threat to [the deputies] or anyone else." *Id.* ¶ 140. The deputies argue that the force was not excessive and that they are entitled to qualified immunity. Deputy MTD at 10–12.[3]

---

[3] Although the parties have not briefed the issue, it is somewhat unclear whether Percival has pleaded a freestanding excessive force claim at all. The Eleventh Circuit has identified two types of excessive force claims under § 1983—"genuine excessive force claim[s]" that "relate[] to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest" and "artificial claims . . . that an officer's use of force is excessive only because an arrest was not supported by probable cause." *Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022) (quotations omitted). To prohibit double recovery "when the absence of probable cause is the only thing that makes an officer's use of force unreasonable," an "artificial excessive force claim . . . is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Id.* (quotations omitted). The amended complaint alleges that Percival "was not resisting and did not pose any threat" but adds that "there was no probable cause to arrest [her] for any criminal offense." Am. Compl. ¶ 140. To the extent that Percival relies on the second allegation as the basis for the excessive force claim, *Richmond* likely forecloses a standalone claim.

"Excessive force claims in the context of an arrest or investigatory stop are judged under the Fourth Amendment's objective reasonableness standard." *Richmond*, 47 F.4th at 1182 (quotations omitted). "In reviewing the use of force, courts balance the nature and quality of the intrusion on the individual against the government justification for using force," "consider[ing] (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quotations omitted). Courts "also consider the justification for the application of force, the relationship between the justification and the amount of force used, and the extent of any injury inflicted." *Id.* Based on these factors, the Eleventh Circuit has "elucidated some general principles." *Id.* at 1182. First, " 'unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment.' " *Id.* (quoting *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011)); *but see id.* at 1183 ("[O]fficers may use de minimis force in arresting a suspect, even without resistance."). Second, "the absence of a legitimate law enforcement justification for using force is indicative of excessive force." *Id.*

These principles compel the conclusion that Percival has stated an excessive force claim and that the deputies are not entitled to qualified immunity based on the allegations in the amended complaint. Taking Percival's allegations as true and construing them in her

favor, the deputies launched a "takedown" that slammed Percival's head into the floor and then pressed her into the ground under two officers' full bodyweight simply because she continued to ask the deputies to leave her home and refused to "shut up." *See* Am. Compl. ¶¶ 84–107. To be sure, Percival had run around the house, yelled at the deputies to leave, called 911, and grabbed her checkbook to prevent Leduc from taking it. *See id.* ¶¶ 16–83. But the deputies never ordered Percival not to do any of that except for the aforementioned "shut up," and Percival was not actively resisting arrest as alleged. In essence, the amended complaint alleges that the deputies "unnecessarily thr[ew]" a "non-resisting, unhandcuffed suspect[] on the ground." *Richmond*, 47 F.4th at 1184. That is enough to state a claim that the deputies violated both the Fourth Amendment and clearly established law. *See id.* (collecting cases denying qualified immunity in similar circumstances).

### 4.  Count IV: § 1983—False Arrest

"To succeed on a false arrest claim [under § 1983], a plaintiff must establish (1) a lack of probable cause and (2) an arrest." *Richmond*, 47 F.4th at 1180. Count IV alleges that the deputies "intentionally arrested and detained [Percival] without an arrest warrant and without probable cause knowing that neither existed." Am. Compl. ¶ 146; *see also id.* ¶¶ 84–105 (recounting the "takedown" and the events leading to Percival being handcuffed). The deputies argue that there was probable cause and that they are entitled

to qualified immunity. Deputy MTD at 12–13. At this juncture, I disagree with the deputies on both points.

Percival limits her arguments on probable cause to the 911 call, Resp. at 15–17, and the deputies decline to articulate any argument on the merits beyond a conclusory statement that "probable cause existed for [Percival's arrest] based on the actions . . . as described in the [a]mended [c]omplaint," Deputy MTD at 13 (emphases omitted). Instead, the deputies urge me to give controlling weight to the facts found in Percival's criminal case. *See id.* And although the deputies gesture at qualified immunity, they do not substantively discuss arguable probable cause. *See id.* I cannot replace the facts allegedly found in Percival's criminal case with those in the amended complaint for the same reasons I did not do so with respect to the Sheriff. Taking the amended complaint's allegations as true and construing them in Percival's favor, Percival adequately pleads the absence of actual probable cause. I also decline to dismiss Count IV based on qualified immunity at the pleading stage for the same reasons as in Count II.

### 5. Count V: § 1983—Illegal Search of a Home

Count V alleges that the deputies "conducted an illegal search of [Percival's] home" by entering "without a warrant, consent, probable cause, or a warrant exception." Am. Compl. ¶ 152. The deputies are correct that Count V should be dismissed as duplicative of Count I, Percival's alleged unconstitutional entry claim. Deputy MTD at 13–14. Both

the substance and the theory of these claims are identical. *Compare* Am. Compl. ¶ 127 (Count I) (alleging that that the deputies "unlawfully entered [Percival's] home without a warrant or a warrant exception in violation of [her] rights under the Fourth Amendment"), *with id.* ¶ 152 (Count V) (alleging that the deputies "conducted an illegal search of [Percival's] home when they crossed the threshold of [the] home absent a warrant, consent, probable cause, or a warrant exception, in violation of [Percival's] rights under the Fourth Amendment"). Because the two claims are entirely duplicative and not merely similar, Count V fails.

### 6.  Count VI: § 1983—Malicious Prosecution

To state a claim for malicious prosecution under § 1983, Percival must allege the common law elements of malicious prosecution,[4] as well as "(1) that the [deputies] violated [her] Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against [her] terminated in [her] favor." *Luke v. Gulley* (*Luke II*), 50 F.4th 90, 95 (11th Cir. 2022) (quoting *Luke v. Gulley* (*Luke I*), 975 F.3d 1140, 1143 (11th Cir. 2020)). "The first element requires proof that 'the legal process justifying [her] seizure was constitutionally infirm' and that '[her] seizure would not otherwise be justified without legal process.' " *Id.* (quoting Williams v. Aguirre, 965 F.3d 1147, 1165

---

[4] "The constituent elements of the common law tort of malicious prosecution include: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023) (alterations omitted) (quotations omitted).

(11th Cir. 2020)). Count VI alleges that the deputies maliciously "initiated charges [of battery, resisting an officer without violence, and misuse of the wireless 911 system] against [Percival]" without probable cause. Am. Compl. ¶¶ 157–59. These charges were eventually terminated. *Id.* ¶¶ 125, 160. The deputies argue that Count VI should be dismissed because there was probable cause and because they are entitled to qualified immunity, asserting similar arguments to those raised with respect to Count IV. Deputy MTD at 14–15.

For the reasons I have already explained, I conclude that the allegations in the amended complaint, taken as true and construed in Percival's favor, establish the lack of actual probable cause. I also do not rely on facts found in Percival's criminal proceeding. As to qualified immunity, arguable probable cause is again the relevant standard. *See Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010). Given my conclusions on actual probable cause and in the light of the deputies' failure to substantively brief

arguable probable cause, I decline to dismiss Count VI based on qualified immunity at the pleading stage.

### 7. Count VII: State Law Malicious Prosecution

Count VII is a state law mirror of Count VI. *See* Am. Compl. ¶¶ 163–70. The deputies reiterate their probable cause arguments, Deputy MTD at 16, which fail at the pleading stage for reasons I have already discussed.

### 8. Count VIII: State Law Battery

Count VIII alleges a near-identical battery claim against the deputies in their individual capacities as Count IX does against the Sheriff. The only substantive difference between the two is the conclusory allegation in Count VIII that the deputies "used excessive and unreasonable force" to perform the acts alleged. Am. Compl. ¶ 172. The deputies repeat the Sheriff's merger argument and contend that any force used was not excessive under the circumstances. Deputy MTD at 16–18. For the same reasons that I denied the Sheriff's motion as to Count IX, I deny the deputies' motion as to Count VIII.

### 9. Count X: State Law Trespass

Count X alleges civil trespass and is identical to Count XI except that it is directed against the deputies in their individual capacities. The deputies' arguments in favor of dismissal are identical to the Sheriff's apart from § 768.28(9)(a), which is inapplicable to

individual capacity suits. Thus, the deputies' arguments for dismissal fail at the pleading stage for the reasons I have already discussed with respect to Count XI.

### 10. Count XII: State Law False Imprisonment/Arrest

Similarly, Count XII is a carbon-copy of Count XIII except directed against the deputies in their individual capacities rather than the Sheriff. Am. Compl. ¶¶ 196–202. The deputies argue that there was probable cause to arrest Percival and that Percival failed to allege intent to confine. Deputy MTD at 20–21. I decline to adopt the deputies' probable cause arguments for the reasons articulated at length elsewhere. And Percival has plausibly alleged intent to confine. *See* Am. Compl. ¶¶ 85–87, 197–98. Count XII survives at the pleading stage.

### 11. Count XIV: State Law Illegal Search of Home

Both the allegations in Count XIV and the arguments for and against dismissal are near-identical to Count XV except that the former is directed against the deputies in their individual capacities. Thus, for the reasons I have already explained with respect to Count XV, the deputies' arguments fail at the pleading stage. Count XIV also survives.

### 12. Count XVI: Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress under Florida law, Percival must allege: "(1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe."

37

*Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594 (Fla. 2d DCA 2007). Count XVI alleges that the deputies committed "extremely outrageous" conduct based on their "illegal ent[ry]" into her home and "physical[] abuse[]." Am. Compl. ¶ 222. The deputies argue that Count XVI should be dismissed because Percival fails to allege sufficiently outrageous conduct to support an intentional infliction of emotional distress claim. Deputy MTD at 22–23. Here, I agree with the deputies.

"Whether conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a question of law, not a question of fact." *Steadman*, 968 So. 2d at 595 (footnote omitted). To be sufficiently severe, "conduct [must be] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d. (1965)). "[R]eckless disregard of the potential for [tragic results]" is not enough. *Id.* at 279. Percival's one-paragraph response, which cites only a single nonbinding decision, argues "that the conduct of the [d]eputies was extremely outrageous as they illegally entered [Percival's] home, physically abused her, and caused her a lifetime of emotional distress." Resp. at 29; *see also id.* (citing *Tarantino v. Citrus Cnty. Gov't*, No. 12-cv-434, 2013 WL 12153541 (M.D. Fla. Oct. 9, 2023)).

But Percival's lone authority shows exactly why the conduct she alleges, even taken as true and construed in her favor, cannot meet Florida's "very high standard for claims of

intentional infliction of emotional distress." *Tarantino*, 2013 WL 12153541, at *5. In *Tarantino*, the Magistrate Judge recommended denying a motion to dismiss when the complaint alleged officers acted outrageously "when they conducted two strip searches and a body cavity search of Plaintiff, including the forcible removal of Plaintiff's tampon." *Id.* The strip searches occurred "in the plain view of passers-by." *Id.* at *2. In contrast, at absolute worst Percival alleges that the deputies entered her home in violation of clearly established law and then "physically abused her" by restraining her and then later executing an overly aggressive takedown maneuver. Am. Compl. ¶ 222. Accepting the truth of these allegations, the deputies acted wrongfully. But even reckless disregard for potential tragedy is not enough to support an intentional infliction of emotional distress claim when the conduct alleged is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *McCarson*, 467 So. 2d at 279 (quotations omitted). Percival's allegations do not meet that exceedingly high bar, even at the pleading stage.

## C.  Punitive Damages

Percival requests punitive damages against the deputies in Count XVI and in her cumulative request for relief. Am. Compl. ¶¶ 225; *see id.* at 31 (requesting "[p]unitive damages under federal and state law"). Both the Sheriff and the deputies argue that I should strike these requests because punitive damages are impermissible against government employees under both state and federal law, Chronister MTD at 24; Deputy MTD at 24,

and Percival responds that she seeks such damages only against the deputies in their individual capacities, *see* Resp. at 30. Percival is correct that punitive damages are available against government defendants sued in their individual capacities. *See Young Apts., Inc. v. Town of Jupiter*, 529 F.3d 1027, 1047 (11th Cir. 2008); § 768.28(5)(a), FLA. STAT. (explaining only that the liability of "[t]he state and its agencies and subdivisions . . . shall not include punitive damages"). Thus, I grant the Sheriff's motion to strike Percival's request for punitive damages with respect to him, but deny the deputies' request to strike the request for punitive damages as to them.

## IV.   CONCLUSION

Accordingly, it is **ORDERED**:

1.   The Motions to Dismiss (Docs. 22, 25) are **GRANTED-IN-PART** and **DENIED-IN-PART**.

2.   Count XI is **DISMISSED without prejudice** as to the Sheriff only. Counts IX, XIII and XV are **DISMISSED without prejudice**.

   a.   Percival is granted leave to amend Counts IX, XI, XIII, and XV to properly allege compliance with § 768.28(6)'s pre-suit notice requirement. Any amendment must be filed no later than **March 29, 2024.**

3.   Count V is **DISMISSED with prejudice**. Count XVI is **DISMISSED with prejudice** as to the deputies only.

4.   The Sheriff's motion to strike is **GRANTED**. Percival's request for punitive damages is **STRUCK** so far as she requests punitive damages based on claims against the Sheriff in his official capacity. The deputies' parallel motion to strike is **DENIED**.

5.     Defendants' Unopposed Motion to Amend the Case Management
Scheduling Order (Doc. 65) is **GRANTED**. The parties may file an
amended Case Management Report in the light of this order no later than
**March 29, 2024**. Otherwise, an Amended Case Management Scheduling
Order will be forthcoming based on the motion to amend.

**ORDERED** in Tampa, Florida, on March 8, 2024.

Kathryn Kimball Mizelle
United States District Judge

41