# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

DIANA PERCIVAL,

     Plaintiff,

v.                                          Case No. 8:23-cv-1243-KKM-LSG

SHERIFF CHAD CHRONISTER,
in his official capacity,
DEPUTY MARCOS PERERA,
in his individual capacity,
DEPUTY JORDAN
BRIZENDINE,
in his individual capacity, and
DAVID LEDUC,

     Defendants.

_____

## <u>ORDER</u>

Diana Percival alleges that Deputies Marcos Perera and Jordan Brizendine violated federal and state law when they entered her home and arrested her. Percival pleads ten claims against the deputies in their individual capacities and four claims against Sheriff Chad Chronister in his official capacity. Perera, Brizendine, and Chronister (the Sheriff Defendants) move for summary judgment as to all fourteen

claims. Mot. for Summary J. (MSJ) (Doc. 116). For the reasons below, I grant in part and deny in part the motion.

## I.    BACKGROUND

In 2017, David Leduc and Diana Percival began a romantic relationship. Joint Statement of Undisputed Facts (JSUF) (Doc. 117) ¶ 5. Leduc began spending more time at Percival's home, and Percival gave him a garage door opener to use for entry. MSJ at 2; Resp. (Doc. 129) at 2. Leduc testified that he lived with Percival for the next two years. Leduc Dep. (Doc. 116-3) at 29:16–18. He kept clothing, medicine, and toiletries at the home as well as a computer monitor and hard drive that he used to operate his business. *Id.* at 33:15–34:14, 44:3–11, 68:19–25. Over the same period, though, Leduc maintained his own residence. *See id.* at 13:17–25; *see* (Doc. 129-2) at 9. His name was never on the deed to Percival's home, and he never paid rent, contributed to Percival's mortgage, or assisted with utility bills. *Id.* at 112:2–4, 114:10–15. Also, Percival claims that she never gave Leduc a key. Percival Dep. (Doc. 116-4) at 47:1–23.

When the romance came to an end, Percival disabled Leduc's garage door opener and "locked [Leduc] out of the house." JSUF ¶ 6 (quoting Leduc Dep. at 39:1). Leduc, needing some of his belongings that remained in the home, called the

2

police for assistance. *Id.* On May 23, 2020, Deputy Marcos Perera accompanied Leduc to Percival's home. JSUF ¶ 7. According to Perera, Percival advised him that Leduc had lived at the residence, Perera Dep. (Doc. 116-1) at 22:22–23:2, 26:22–27:6, but Percival was "uncooperative" and denied Leduc entry. JSUF ¶ 8. Percival denies telling Perera that Leduc lived with her. Percival Dep. at 59:9–23.

About a week later, Deputy Perera was again dispatched to Percival's home to assist Leduc. JSUF ¶ 9; Leduc Dep. at 59:2–4. According to Percival, when Perera and Leduc walked to the door, Perera informed her that Leduc was there "to get into his residence," which was reflected on his driver's license. Percival Dep. at 74:1–19.[1] Percival responded that Leduc did not reside at the home. *Id.* In the light of Percival's demeanor and behavior and the "fact that [Percival and Leduc] both claimed [a week prior] that [Leduc] lived there," Perera testified that he "truthfully believed" that Leduc lived at the home and that Percival claimed otherwise only "because she didn't want to give [Leduc] his property back." Perera Dep. at 32:12, 70:7–18.

---

[1] Perera testified that he reviewed Leduc's license, and it revealed an address other than Percival's. Perera Dep. at 35:1–8. Although this gave Perera "pause," Perera explained that because "plenty of people" do not "update their addresses on their licenses," the disparity was "not an end all be all decision maker." *Id.* at 35:11–17.

According to video footage of Percival's front porch, Percival let Leduc inside after about two minutes. (Doc. 116-6) at 1:00–2:50. But when Perera followed, Percival told Perera "to get out," and both Perera and Leduc exited. *Id.* at 2:54–3:23; Perera Dep. at 30:8–31:15; Percival Dep. at 82:17–19. Believing that Leduc was a resident, Perera told Leduc that he "was allowed to make entry . . . however he needs to." Perera Dep. at 41:1–3. A few minutes later, Leduc attempted to reenter. (Doc. 116-6) at 5:41–45. In response, Percival, standing in the doorway, placed her hand on Leduc's chest and pushed him backwards:



(Doc. 116-7). Perera believed that Percival committed the crime of simple battery by shoving Leduc but decided not to arrest her. Perera Dep. at 41:13–42:13; Perera's Criminal Report Aff. (Doc. 116-10) at 2. Perera had called for backup and wanted to wait before arresting Percival. Perera Dep. at 34:10–16, 42:10–13.

Deputy Brizendine arrived shortly thereafter. Brizendine Dep. (Doc. 116-2) at 22:15–21; (Doc. 116-6) at 8:50–9:06. Perera informed Brizendine that Leduc "was a lawful resident of the home, and that while [Perera] was there communicating with the both of them, he observed Ms. Percival shove Mr. Leduc in the chest." Brizendine Dep. at 25:21–26:1. Although Percival, "screaming to the top of her lungs through the front door," insisted that Leduc did not live at the home or have possessions there, Leduc informed Brizendine that he lived at the home and operated a business out of it. *Id.* at 32:11–14, 35:13–14. Based on the information Perera provided, Brizendine believed that probable cause existed to arrest Percival for domestic battery. *Id.* at 87:10–17.

As Perera briefed Brizendine on the situation, Leduc and Percival continued to argue near the doorway. (Doc. 116-6) at 9:11–10:10. The deputies then approached the door and Brizendine informed Percival that, because Leduc was a legal resident, he was allowed to enter the home. Brizendine Dep. at 38:13–15.

Percival continued to deny that Leduc lived there. *Id.* at 39:5–8. Although Brizendine suggested to Leduc that he should obtain a court order, he also told Leduc that he could "use any means necessary to get into the home." *Id.* at 39:9–14. Eventually, Leduc pushed his way into the home through the front door. (Doc. 116-6) at 11:54–59. For Leduc's protection and out of the belief that "violence could reoccur," the deputies followed him in. *Id.* at 11:59–12:06; *see* Brizendine Dep. at 55:2–10.

Once inside, Leduc began gathering his belongings, including some letters listing Leduc's name and Percival's address. JSUF ¶ 12; Brizendine Dep. at 73:10–22. Percival alleges that when she grabbed her checkbook to prevent Leduc from taking it, Brizendine grabbed her from behind, held her arms to her side, and pressed his chest to her back, only releasing her once Leduc told Brizendine that the checkbook belonged to Percival. Percival Aff. (Doc. 129-1) ¶¶ 25–26. Fearing for her safety, Percival called 911 "in hopes that the additional officers would protect [her] against" Leduc, Brizendine, and Perera. *Id.* ¶ 29; JSUF ¶ 13. Perera testified that this call constituted a misuse of 911, a misdemeanor in Florida, because there were already "two law enforcement officers" on the scene and Percival was calling "to report a crime that was not occurring." Perera Dep. at 56:21–57:1.

6

After Leduc collected what he needed, he went to exit the home. The parties are in dispute as to what happened next.

According to Brizendine, Percival "charged at" Leduc as he was exiting. Brizendine Dep. at 75:21–76:3. When Brizendine told Percival not to touch Leduc, Brizendine alleges that Percival charged at him. *Id.* at 76:4–9. Percival got "within an inch of [Brizendine's] face, and she had two balled fists." *Id.* at 76:18–19. Brizendine pushed Percival away, but after she fell to the ground, she "immediately got back up with two fists and proceeded to aggresively charge at" Brizendine again. *Id.* at 78:7–15. This time, Brizendine states that he and Perera each grabbed an arm and restrained Percival. *Id.* at 78:16–20.

Perera recounts these events somewhat differently. Standing behind Brizendine on the steps exiting Percival's living room, Perera never witnessed Percival charge at or threaten Leduc. Perera Dep. at 51:3–5. He testifies that his view of Leduc, though, was "probably" blocked by Brizendine. *Id.* at 74:9–13. Perera's recollection otherwise lines up with Brizendine's. Perera testifies that, as Brizendine was walking up the steps, Percival got into Brizendine's "face probably within an inch or two with her fist[s] clench[ed] and started just screaming . . . like, top of her lungs screaming." *Id.* at 50:14–21. Then, like Brizendine, Perera testifies

7

that the deputies restrained Percival as she charged at Brizendine for a second time. *Id.* at 52:1–7.

The deputies both testify that they took Percival to the ground and then handcuffed her because "she was aggressively" trying to attack them. *Id.* at 52:21–25; Brizendine Dep. at 79:20–21.

According to Leduc, Percival put her hands on him when he was trying to leave the home. Leduc Dep. at 71:19–72:13. Leduc testified that a deputy then reached for Percival's arm, and she pulled it away, which led to the altercation between the deputy and Percival. *Id.* at 74:7–16. Leduc claims that Percival initiated the physical contact with the deputies. *Id.* at 74:20–75:3.

Percival recalls things differently. Percival says that she did not touch Leduc or prevent him from leaving. Percival Aff. ¶¶ 33–34. When Percival asked the deputies to leave, Brizendine told her to "shut up." Percival Dep. at 95:18–20; Percival Aff. ¶¶ 39–40. Then, the deputies gave a signal to each other and charged at her. Percival Dep. at 95:24–96:5; Percival Aff. ¶¶ 43, 45. Percival claims that Brizendine kicked one of her feet out from under her, slammed her to the ground, and placed both of his knees on her right shoulder and neck. Percival Dep. at 96:4–12, 98:4–12; Percival Aff. ¶ 46. Perera joined Brizendine and put one of his legs on

8

Percival's back. Percival Aff. ¶ 47. Percival says that she lost consciousness because of the deputies' actions and woke up handcuffed near her front door. Percival Dep. at 96:15–25; Percival Aff. ¶ 54. Percival denies ever charging at Brizendine, screaming in his face with clenched fists, or fighting with either of the deputies. Percival Dep. at 97:5–98:3.

In response, Brizendine testified that he never had his knees on Percival's neck, back, or legs. Brizendine Dep. at 80:3–81:3. Perera testified that he did not use his knees or body weight to hold Percival down. Perera Dep. at 53:13–54:9. Both deputies deny kicking Percival's foot out from under her. Brizendine Dep. at 80:6–8; Perera Dep. at 60:14–18. Perera and Leduc deny that Percival ever went unconscious. Perera Dep. at 54:9–11; Leduc Dep. at 81:15–17.

As the deputies were carrying Percival to the front door, she informed them that her arm was broken. (Doc. 116-10) at 18. When Hillsborough County Fire Rescue arrived on the scene, Percival refused "to answer any questions" or "to go to the hospital." *Id.* After the officers transported Percival to jail, the jailhouse medical provider did not detect any new injuries but reported that Percival indicated pain on the right side of her body, including in her shoulder. *See* (Doc. 116-8). Percival testified that the right side of her body was numb after the deputies arrested her and

that she continues to experience random and periodic numbness. *Id.* at 99:9–10, 128:18–20. When she was in jail, Percival discovered that she was bleeding from her rectum, and, after release from jail, Percival went to an emergency room. *Id.* at 115:19–116:16. Percival testified that she had to undergo physical therapy and mental health counseling and that she received several injections for pain in her right shoulder. *Id.* at 118:24–120:18, 122:19–25, 124:5–128:22.

The state charged Percival with three misdemeanors: battery, resisting an officer without violence, and misuse of the 911 system. (Doc. 116-12). These charges were later dropped. Second Am. Compl. (Doc. 78) ¶ 124.

In June 2021, Percival, through her counsel's assistant, emailed Sheriff Chronister a presuit notice under § 768.28(6)(a), Florida Statutes. (Doc. 116-5). The notice contained Percival's social security number and date of birth but omitted her place of birth. *Id.* at 3. Percival did not send the notice to the Florida Department of Financial Services.

Percival initiated this action against Leduc, Perera, Brizendine, and Sheriff Chronister in his official capacity. After the Court dismissed Percival's amended complaint in part, Order on Mot. to Dismiss (MTD Order) (Doc. 69), Percival filed

10

a second amended complaint, Second Am. Compl., and the Sheriff Defendants move for summary judgment, *see generally* MSJ.

## II.   LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence of a genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, etc.) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

11

I review the record evidence as identified by the parties and draw all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020); *Reese v. Hebert*, 527 F.3d 1253, 1268 (11th Cir. 2008). Here, to the extent that the record is disputed or capable of multiple inferences, I draw them in favor of the non-movant.

## III.    ANALYSIS

The Sheriff Defendants move for summary judgment as to all fourteen claims against them. *See generally* MSJ.[2] I first address the claims against the deputies and then consider the claims against the Sheriff.

### A. Percival's Claims against the Deputies

Percival brings five federal claims and five state claims against the deputies.

### 1.  Federal Claims

Percival pleads five federal claims against the deputies in their individual capacities. *See* Second Am. Compl. ¶¶ 127–32 (Count I–Unconstitutional Entry into Home); *id.* ¶¶ 133–38 (Count II–False Imprisonment); *id.* ¶¶ 139–44 (Count

---

[2] Civil theft and conversion claims remain against Leduc. *See* Second Am. Compl. ¶¶ 215–26.

III–Excessive Force); *id.* ¶¶ 145–50 (Count IV–False Arrest); *id.* ¶¶ 151–58 (Count V–Malicious Prosecution).

### i. Qualified Immunity

The deputies argue that they are entitled to qualified immunity for all of Percival's federal claims. *See, e.g.*, MSJ at 16–27. "To receive qualified immunity, [a] public official 'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194.[3] "To overcome a qualified immunity defense, the plaintiff must make two showings." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). The plaintiff must first show "that the defendant violated a constitutional right." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). The plaintiff must then "show that the violation was clearly established." *Id.* For the second inquiry, the key question "is whether the state

---

[3] There is no dispute that the deputies were acting within their discretionary authority.

of the law gave the defendants 'fair warning' that their alleged conduct was unconstitutional." *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

A plaintiff has three options when attempting to prove "that the state of the law gives officials fair warning of a clearly established right." *Corbitt*, 929 F.3d at 1312; *accord Gilmore v. Ga. Dep't of Corr.*, No. 23-10343, --- F.4th ----, 2025 WL 1911728, at *8 (11th Cir. July 11, 2025) (en banc); *T.R. ex rel. Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 883 (11th Cir. 2022). First, she can show that "a materially similar case has already been decided." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). To make this showing, a plaintiff is limited to "the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court." *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012). Second, a plaintiff can show that a constitutional right "was clearly established through a 'broader, clearly established principle [that] should control the novel facts [of the] situation.'" *Id.* at 1256 (alterations in the original) (quoting *Mercado*, 407 F.3d at 1159). Third and finally, the plaintiff can "show that [the] case fits within the exception of conduct which so obviously violates that constitution that prior case law is unnecessary." *Mercado*, 407 F.3d at 1159.

14

### ii. Count I: Unconstitutional Entry

"With few exceptions," an officer's warrantless entry of the home is unreasonable and unconstitutional. *Kyllo v. United States*, 533 U.S. 27, 31 (2001). One exception is consent. *McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007). Another exception is "exigent circumstances," such as when an officer enters to "break up a violent fight." *Id.* at 1240–41.

Percival claims that the deputies violated the Fourth Amendment when they entered her home without a warrant or a warrant exception. Second Am. Compl. ¶¶ 127–32. The deputies argue that both Leduc's consent and exigent circumstances justified their warrantless entry. MSJ at 12–16. They also argue that they are entitled to qualified immunity. *Id.* at 16–18. I consider the deputies' exigency argument first and then turn to consent. The deputies' entry violated the Fourth Amendment and clearly established law makes clear that neither exception justifies the warrantless entry into Percival's home.

In *Brigham City v. Stuart*, officers entered the home after hearing a fight and then witnessing, through the window, a juvenile "strik[ing] one of the adults in the face, sending the adult to the sink spitting blood." 547 U.S. 398, 406 (2006). The Supreme Court concluded that "law enforcement officers may enter a home without

15

a warrant to render emergency assistance to an injured occupant or to protect an
occupant from imminent injury." *Id.* at 403. Later cases indicate that this
"emergency aid" exception applies only if officers "have an objectively reasonable
belief that someone inside is 'seriously injured or threatened with such injury,' and is
in need of immediate aid." *United States v. Timmann*, 741 F.3d 1170, 1178 (11th
Cir. 2013) (quoting *Brigham City*, 547 U.S. at 403–404). Such circumstances "have
in common the indicia of an urgent, ongoing emergency, in which officers have
received emergency reports of an ongoing disturbance, arrived to find a chaotic
scene, and observed violent behavior, or at least evidence of violent behavior." *Id.* at
1179. "The specific test is not whether the officer actually believed that there was an
emergency inside the house, but 'whether there was an objectively reasonable basis
for believing that medical assistance was needed, or persons were in danger.' " *United
States v. Evans*, 958 F.3d 1102, 1106 (11th Cir. 2020) (quoting *Michigan v. Fisher*,
558 U.S. 45, 49 (2009)).

The deputies argue that their entry was justified under *Brigham City* because,
after Percival's shove of Leduc, they "had a reasonable, justifiable basis to believe that
once Leduc entered the . . . home Percival might attack him or, at a minimum, that
Percival and Leduc would start physically fighting and someone might be seriously

16

injured." MSJ at 15. Percival responds that there was no "imminent risk of serious injury to Ms. Percival or Leduc." Resp. at 16. Percival notes that the shove happened more than six minutes before the deputies' entry into the home and points out that, between the shove and entry, the officers allowed Percival and Leduc to speak alone on the porch, demonstrating the lack of any "need for the deputies to patrol or save them from each other." *Id.*

To overcome the deputies' qualified immunity defense, Percival must prove that the law at the time supplied the deputies with fair warning that an exigency did not support their warrantless entry into her home. *See Vaughan*, 343 F.3d at 1332. Percival meets her burden because she shows that "a broader, clearly established principle should control the novel facts in this situation." *Mercado*, 407 F.3d at 1159. At the time of the deputies' entry into Percival's home, precedent had long made clear that "an officer's warrantless entry of the home is [ordinarily] unreasonable and unconstitutional." *Kyllo*, 533 U.S. at 31. It was equally well-established that, for "exigent circumstances" to justify warrantless entry, an officer must "have an objectively reasonable belief that someone inside is 'seriously injured or threatened with such injury,' and is in need of immediate aid." *Timmann*, 741 F.3d at 1178 (quoting *Brigham City*, 547 U.S. at 403–404). Precedent provides that the

17

touchstones for this exception are that threat of injury is ongoing, serious, and occurring within the home, and "every reasonable officer" would have recognized that these touchstones were missing here. *Nelson v. Tompkins*, 89 F.4th 1289, 1299 (11th Cir. 2024).

To justify their entry, the deputies rely on Percival's shove of Leduc and Percival's behavior in response to Leduc attempting to enter her home. MSJ at 14–15; *see, e.g.*, Brizendine Dep. at 55:2–10, 56:7–10, 65:19–24. Precedent provides fair warning that these circumstances were not exigent. For one, although definitionally a battery, Percival's touching of Leduc's chest hardly constitutes "violent behavior," *Timmann*, 741 F.3d at 1179, nor does it provide a basis to conclude that entry into the home was necessary to protect Leduc from "from imminent danger," *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002). This case is far afield from *Brigham City*, where the officers witnessed a juvenile wrangle free from some adults, punch another adult in the face causing bloody spittle, and then witnessed a brawl ensue inside the house. *See* 547 U.S. at 401. The Supreme Court reasoned that an officer need not stand idly by outside while these acts of violence transpired inside. From the undisputed evidence in this case, no comparable emergency existed. At best, Percival pushed Leduc back while

18

standing in her front door entryway, clearly objecting to one thing: Leduc and the deputies entering her home. There was no reasonable basis to conclude that a warrantless entry was necessary "to protect both Percival and Leduc from imminent danger and physical harm." MSJ at 15.

To be sure, "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49. But even in *Fisher*, the officers arrived to a "tumultuous scene," found "signs of a recent injury," and witnessed "violent behavior inside" the home, as Fisher was "screaming and throwing things." *Id.* at 48. That is not similar to Perera witnessing a shove that Leduc "may have been oblivious to." Leduc Dep. at 56:10. The deputies then listened to Percival scream in protest that Leduc did not live there or have any property inside her home. *See* Brizendine Dep. at 35:7–36:16, 38:2–7. Although screaming might serve as indicia of an exigent circumstance, *see, e.g.*, *Fisher*, 558 U.S. at 48, the deputies do not plausibly explain why Percival's protests evidence the sort of emergency that supports a warrantless entry.

Of course, the context matters. Here, Percival was screaming about the deputies and Leduc not entering her home, for which they had no warrant and Leduc had no key. That is quite different than Percival creating a ruckus related to another

19

matter that might escalate independent of the very constitutional violation that she feared might occur. The logical conclusion of the deputies' argument is that a homeowner's exercise of her property rights provides a basis for an exception to the Fourth Amendment's warrant requirement. But a homeowner's protest, without more, is insufficient. *Cf. United States v. Alexander*, 835 F.2d 1406, 1409 n.3 (11th Cir. 1988) ("[A] defendant's refusal to consent to a search cannot establish probable cause to search. A contrary rule would vitiate the protections of the Fourth Amendment.").

For these reasons, the deputies fail to convince that the "exigencies of the situation [made] the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quotation marks and citation omitted). Although the possibility of some altercation existed if Leduc entered Percival's home based on Percival's clearly agitated demeanor, the events leading up to the deputies' entry provided no "objectively reasonable belief" that Leduc and Percival were in imminent need of protection from serious harm. The shove, if it could be called that, occurred several minutes before the entry into the home. Thus, at the time of entering, the officers did not go into the home to disrupt an ongoing fight or assault, nor did they

20

observe Leduc or Percival suffering physical harm. These facts clearly fail the exigent circumstances exception to warrantless entry.

The deputies also fail to convince that binding precedent on the matter is anything other than "firm" and "bright." *Kyllo*, 533 U.S. at 40. The "unlawfulness" of the deputies' entry was "apparent" in "the light of preexisting law," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), as precedent put the deputies on "notice" that exigent circumstances did not support their warrantless entry, *Mercado*, 407 F.3d at 1159.

The same is true concerning the consent exception. The deputies contend that they reasonably believed that Leduc "possessed sufficient authority to consent to their entry into the home." MSJ at 13. Although valid consent is a recognized basis for a warrantless search, *United States v. Watkins*, 760 F.3d 1271, 1279 (11th Cir. 2014), the Supreme Court has already ruled, in a case much like this, that a "physically present inhabitant's express refusal of consent to a police search" takes precedence over "the consent of a fellow occupant." *Georgia v. Randolph*, 547 U.S. 103, 122–23 (2006). As I have already concluded, *Randolph* put the deputies "on notice that relying on Leduc's consent to justify warrantless entry in the face of

21

Percival's objection violated the Fourth Amendment." MTD Order at 26. It follows

that the deputies are not entitled to qualified immunity.

For these reasons, viewing the record in the light most favorable to Percival,

the deputies violated clearly established law by entering her home without a warrant.

*Cf. Bashir v. Rockdale County*, 445 F.3d 1323, 1331 (11th Cir. 2006) ("A

reasonable law enforcement officer faced with these circumstances would have

known he could not enter the home and arrest [the plaintiff] without a warrant,

exigent circumstances, or consent."). Accordingly, I deny summary judgment on

Count I.

### iii. Count II: False Imprisonment

"A false imprisonment claim under § 1983 requires meeting the common law

elements of false imprisonment and establishing that the imprisonment was a due

process violation under the Fourteenth Amendment." *Helm v. Rainbow City*, 989

F.3d 1265, 1278 (11th Cir. 2021). "The elements of common law false

imprisonment are an intent to confine, an act resulting in confinement, and the

victim's awareness of confinement." *Campbell v. Johnson*, 586 F.3d 835, 840 (11th

Cir. 2009) (per curiam). To establish a due process violation, "a plaintiff must show

that the officer acted with deliberate indifference, i.e., demonstrating that the officer

'had subjective knowledge of a risk of serious harm and disregarded that risk by actions beyond mere negligence.'" *Helm*, 989 F.3d at 1278–79 (quoting *Campbell*, 586 F.3d at 840).

"If an officer has arguable probable cause to seize an individual, that finding may defeat a claim of deliberate indifference." *Id.* at 1279. An officer has probable cause if "a reasonable officer could conclude that there was a substantial chance of criminal activity." *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (omission adopted) (quoting *District of Colombia v. Wesby*, 583 U.S. 48, 61 (2018)). "An officer has arguable probable cause if 'a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests.'" *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (emphasis omitted) (quoting *Wesby*, 583 U.S. at 61).

Percival's false imprisonment claim is predicated on the allegation that the deputies "unlawfully, intentionally, and unreasonably restrained Ms. Percival to the inside of her home and deprived Ms. Percival of the right to leave." Second Am. Compl. ¶ 134. The deputies argue that they are entitled to qualified immunity because they had "probable cause to arrest Percival on June 2, 2020 for the crime of battery (simple and domestic), and for the crime of misuse of the 911 system." MSJ

23

at 19. Percival responds that the deputies detained her by remaining on her property after she asked them to leave and that, because this happened before the alleged battery, the deputies lacked probable cause. Resp. at 17, 21.

The deputies are entitled to summary judgment. To start, Percival fails to demonstrate that the deputies were on notice that, by remaining on her property during an ongoing domestic dispute, they were detaining her in violation of the Constitution. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (asking "whether the violative nature of particular conduct is clearly established"). Percival relies on *Morris v. Town of Lexington*, where the Eleventh Circuit said that officers "effectively detained" the plaintiff when they "stood in the doorway and refused to leave when asked to leave." 748 F.3d 1316, 1325 (11th Cir. 2014). She also cites *Thornton v. City of Macon*, where the Eleventh Circuit concluded that the officers' "continued presence" on the plaintiff's front porch was "not pursuant to their official duties and was outside of their authority" after the plaintiff asked them to leave. 132 F.3d 1395, 1399 (11th Cir. 1998) (per curiam). Neither case puts the deputies on notice that they detained Percival by standing in her front yard and on her porch while she argued with Leduc.

By the time the deputies detained Percival—either when they remained in her home after Leduc left or when they arrested her—they had probable cause to do so. "Whether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010). In Florida, the offense of battery occurs when a person "[a]ctually and intentionally touches or strikes another person against the will of the other" or "[i]ntentionally causes bodily harm to another person." § 784.03(1)(a), Fla. Stat. "As the statute's plain text indicates," "any unwanted 'touch[]' will suffice." *Huebner v. Bradshaw*, 935 F.3d 1183, 1188 (11th Cir. 2019); *see State v. Hearns*, 961 So. 2d 211, 218–19 (Fla. 2007) ("Existing case law makes it clear that any intentional touching, no matter how slight, is sufficient to constitute a simple battery."). Thus, battery "may be committed with only nominal contact." *Hearns*, 961 So. 2d at 219.

Percival shoved Leduc before the deputies entered the home. *See* (Doc. 116-6) at 5:41–45 (video footage of the shove). Although only "nominal contact," *Hearns*, 961 So. 2d, it was "objectively reasonable under the totality of the circumstances" for Perera to conclude that Percival committed simple battery when he witnessed her touch Leduc, *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.*,

25

956 F.2d 1112, 1119 (11th Cir. 1992), and for Brizendine to reach the same conclusion based on what Perera told him when he arrived on the scene, *see Terrell*, 668 F.3d at 1252 ("[B]oth the United States Supreme Court and the Florida Supreme Court have allowed the collective knowledge of the investigating officers to be imputed to each participating officer.").[4] Because the deputies' actions were supported by probable cause, Percival cannot, as a matter of law, demonstrate that the deputies acted with deliberate indifference. *See May v. City of Nahunta*, 846 F.3d 1320, 1329 (11th Cir. 2017).

In response, Percival first argues that she "did not intentionally touch Leduc" against his will but instead "Leduc walked into Ms. Percival in an attempt to bulldoze his way through her and enter her home." Resp. at 21. The video footage, though, demonstrates that a reasonable officer at the scene, here Perera, could have concluded that Percival intentionally touched Leduc against his will and thus committed simple battery. *See Washington*, 25 F.4th at 902. This conclusion holds even though Leduc later stated that any physical contact during the incident "occurred with [his] consent." (Doc. 129-2) at 4; *cf. Harris v. Hixon*, 102 F.4th

---

[4] As a result of this conclusion, I need not consider whether the deputies had probable cause to arrest Percival for misuse of the 911 system in violation of § 365.172(14), Florida Statutes, or resisting an officer without violence, in violation of § 843.02, Florida Statutes.

1120, 1126 (11th Cir. 2024) ("The charges against Harris were ultimately dismissed,
but that does not negate the existence of probable cause at the time of his arrest.").

Percival next argues that "no reasonable officer could determine there was
probable cause given" that she acted in self-defense. Resp. at 21. For example,
Florida law provides that a person in "a dwelling or residence in which the person
has a right to be," "has the right to stand his or her ground and use or threaten to
use . . . [n]ondeadly force against another when and to the extent that the person
reasonably believes that such conduct is necessary to defend himself or herself or
another against the other's imminent use of unlawful force." § 776.013(1), Fla. Stat.;
*see id.* § 776.012 (defense of person).

Because Florida law immunizes from arrest, detention, and prosecution, a
"person who uses or threatens to use force" as permitted in §776.012 and § 776.013,
an officer "may not arrest the person for using or threatening to use force unless it
determines that there is probable cause that the force that was used or threatened
was unlawful." *Id.* § 776.032, (1)–(2). Percival argues that, reading the record in her
favor, the deputies knew that Leduc did not live at the home, and thus "every
reasonable officer would arrest Leduc for committing a forcible felony, burglary

battery, against Ms. Percival and find that Ms. Percival did not commit a battery." Resp. at 21.

Percival's self-defense argument does not negate a probable cause finding. For one, even when viewing the record in the light most favorable to Percival, it remains the case that the deputies received conflicting information as to whether Leduc resided at the home. *See* Perera Dep. at 34:17–20, 47:19–21 (testifying that Leduc told him he lived at the home, but that Percival told him the opposite); Brizendine Dep. at 32:11–24 (same). Percival does not cite record evidence supporting the assertion that "the deputies knew Leduc did not live at her home." Resp. at 21.[5] Even if, as a matter of fact, Percival accurately represented that Leduc did not reside in her home, the deputies' actions are judged based on "the facts and circumstances within the [their] knowledge" at the time of the arrest, not ex post factual determinations. *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990). The deputies were not "required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present[ed] a sufficient basis

---

[5] Although Percival makes much out of the fact that Leduc's driver's license did not list her home address, Resp. at 4, 7, Perera plausibly explains why the different address was "not an end all be all decision maker," Perera Dep. at 35:16–17; *see id.* at 35:14–16 ("It gave me pause for a moment, but there's plenty of people who don't update their addresses on their licenses.").

for believing that an offense ha[d] been committed." *Huebner*, 935 F.3d at 1188 (alterations in the original) (quoting *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002)). Indeed, the Florida Supreme Court has concluded that, "in most potential self-defense cases," a post-arrest immunity determination "will be the best that we can do—procedurally—considering the well-established body of law detailing the responsibilities of law enforcement officers, prosecutors, and judges," *Kumar v. Patel*, 227 So. 3d 557, 560 (Fla. 2017). This case is no exception. In the light of the conflicting information the deputies received, the deputies could have concluded that Percival's shove was not in response to "imminent use of unlawful force," §§ 776.012(1), 776.013(1), Fla. Stat.

Percival's final probable cause argument is predicated on *K.W.S. v. State*, 924 So. 2d 80 (Fla. 5th DCA 2006). There, the juvenile defendant "attempted to defend his younger sister who was involved in a fracas with a larger, older girl" by separating the two young women. *Id.* at 81. The use of force "was minimal, and "could well have been accidental." *Id.* On these facts, the defendant "established a prima facie case of defense of another," and the state failed to rebut it, so the Fifth District Court of Appeal held that the defendant's motion for judgment of dismissal should have been granted. *Id.* at 81–82.

29

*K.W.S.* does not inform the probable cause determination here. Most importantly, *K.W.S.* arises in an entirely different posture. In adjudicating a motion for judgment of dismissal, the question is whether the state put forward enough evidence to "disprove the defense of self-defense beyond a reasonable doubt." *E.L.F. v. State*, 33 So. 3d 760, 763 (Fla. 4th DCA 2010). Probable cause, on the other hand, "does not require anything close to conclusive proof or proof beyond a reasonable doubt that a crime was in fact committed, or even a finding made by a preponderance of the evidence." *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019). Therefore, *K.W.S.* does not provide much insight into the question at issue here.

In sum, because the deputies had probable cause to believe that Percival battered Leduc, the deputies are entitled to summary judgment on Count II. *See May*, 846 F.3d at 1329.

### iv. Count III: Use of Excessive Force

Eleventh Circuit precedent distinguishes between "genuine" and "artificial" excessive force claims. A "genuine" excessive force claim "is a claim that—irrespective of an officer's probable cause to make an arrest—the officer used excessive force." *Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022). An

"artificial" excessive force claim, or a claim "that force was excessive merely because another Fourth Amendment violation occurred," is "subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Id.* (quoting *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000)).

A "genuine" excessive force claim "in the context of an arrest or investigatory stop [is] judged under the Fourth Amendment's objective reasonableness standard." *Id.* at 1182. "In reviewing the use of force, courts balance the nature and quality of the intrusion on the individual against the government justification for using force," "consider[ing] (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quotations omitted). Courts "also consider the justification for the application of force, the relationship between the justification and the amount of force used, and the extent of any injury inflicted." *Id.*

Percival alleges that the deputies' use of force in arresting her was excessive because: (1) she was not resisting; (2) she did not pose any threat; and (3) there was no probable cause to arrest her. Second. Am. Compl. ¶¶ 140–41. The deputies move

for summary judgment on the basis that her excessive force claim is subsumed by her false arrest claim and because they are entitled to qualified immunity. MSJ at 22–27.

Percival's claim that the force was excessive because the deputies lacked probable cause to arrest her is foreclosed by Eleventh Circuit precedent. *See Richmond*, 47 F.4th at 1180. Therefore, Percival's arguments about a lack of probable cause are of no help in supporting her excessive force claim.

But Percival also mounts a "genuine excessive force claim," which "is not resolved by the existence of probable cause." *Id.* This claim is predicated on Percival's testimony that the deputies, without any justification, swept her leg out from under her, slammed her to the ground, and placed their legs and knees into her right shoulder and neck, which caused loss of consciousness as well as mental and physical injuries. Percival Aff. ¶¶ 40–57, Percival Dep. at 95:18–98:12, 117:1–119:25.

Because the deputies dispute that account, this is a factual dispute reserved for the jury. Crediting Percival's account, a reasonable jury could find that the deputies used excessive force in violation of the Fourth Amendment. First, the deputies "had no law enforcement justification" for sweeping Percival's leg out from under her, slamming her to the ground, and applying force on her back and neck. *Richmond*, 47 F.4th at 1183. Percival states that the force resulted from her request that the

32

deputies leave her home and denies charging at the deputies or resisting arrest. Percival Dep. at 97:5–98:3. To be sure, the deputies had probable cause to arrest Percival, and an arresting officer "may use de minimis force in arresting a suspect, even without resistance." *Richmond*, 47 F.4th at 1183. But on Percival's telling, the deputies' force was not de minimis, and the use of force was untethered to "any law enforcement need to restrain or arrest [her]." *Id.*

Second, Percival's potential crimes were both misdemeanors of minor severity, *see* §§ 365.172(14) (misuse of 911 system), 784.03(1)(a) (simple battery), Fla. Stat., and Percival "neither posed a threat nor was attempting to flee [her home]," *Richmond*, 47 F.4th at 1182–83. The Eleventh Circuit has "repeatedly held that less force is appropriate when the crime at issue is a misdemeanor, and the suspect does not pose a threat or attempt to flee." *Id.* According to Percival, she never charged or acted aggressively towards anyone, so she was not a threat.

Third, Percival claims that she never "refuse[d] to obey any lawful commands." *Richmond*, 47 F.4th at 1183; *see* Percival Dep. 94:19–23, 97:5–99:1. If believed by the jury, this is another consideration that cuts in favor of Percival's excessive force claim. *See Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011).

33

Putting it all together, if a jury believes Percival's account, the deputies used "unprovoked force against a non-hostile and non-violent suspect who [had] not disobeyed instructions." *Id.* A reasonable jury could therefore find that the deputies violated Percival's Fourth Amendment rights. *See id.*

The deputies' conduct, taking the record in the light most favorable to Percival, also violated clearly established law. Although the Supreme Court has stressed that specificity is "especially important" in excessive force cases, *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam), the Eleventh Circuit has concluded, that its caselaw enumerates a "broader, clearly established principle" that provides fair notice to officers in circumstances much like this one, *Richmond*, 47 F.4th at 1184 (quoting *Mercado*, 407 F.3d at 1159). For example, the Eleventh Circuit has denied qualified immunity "when the police have unnecessarily thrown non-resisting, unhandcuffed suspects on the ground." *Id.* (collecting cases). The Eleventh Circuit, in decisions "dat[ing] to at least 2000," *Patel v. City of Madison*, 959 F.3d 1330, 1343 (11th Cir. 2020), has "repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands," *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014). The Eleventh

34

Circuit has also held "that employing gratuitous force against a docile suspect can meet the 'obvious clarity' test." *Patel*, 959 F.3d at 1343 (collecting cases); *see id.* at 1333–34 (concluding that "no reasonable officer could have thought that sweeping [the plaintiff's] legs out from under him and throwing him to the ground headfirst was a reasonable use of force" when the plaintiff "was somewhat frail and was not resisting or attempting to flee").

Following these cases, if a jury credits Percival's version of events, the law clearly forbade the deputies' actions.

The deputies respond that, under their version of the facts, they did not engage in excessive force when arresting Percival. MSJ at 24–25. Although a jury may believe the deputies, in adjudicating the deputies' motion for summary judgment, I must view all facts in the light most favorable to Percival. *See Sconiers*, 946 F.3d at 1262. For the above reasons, a reasonable jury could conclude based on Percival's testimony that the deputies used excessive force.

The deputies also argue that the "fact that nurses at the jail observed no physical injury on Percival's body, and determined she did not require any medical attention, 'reflects that minimal force was used' in effectuating her arrest." MSJ at 26 (quoting *Gold v. City of Miami*, 121 F. 3d 1442, 1446 (11th Cir. 1997)). The

35

deputies cite a physical assessment completed when Percival arrived at jail after her

arrest. (Doc. 116-8). According to the assessment, Percival claimed "[r]ight shoulder

and hip pain 07/10 since arrest." *Id.* at 6. But the nurse did not observe any new

injuries or visible injuries, noted no "trauma to head, face, neck," and observed full

range of motion in Percival's shoulder and neck. *Id.* at 4–6.

Although the Eleventh Circuit considers "the extent of the injury inflicted" in

evaluating excessive force claims, the Eleventh Circuit has rejected the idea that "the

absence of 'some arbitrary quantity of injury' " automatically immunizes an officer

from an excessive force claim. *Saunders*, 766 F.3d at 1270 (quoting *Wilkins v.

Gaddy*, 559 U.S. 34, 39 (2010)). To the contrary, "the nature of the force" remains

the "core judicial inquiry." *Id.* (cleaned up) (quoting *Wilkins*, 559 U.S. at 39). For

that reason, the Eleventh Circuit has concluded "that a § 1983 plaintiff alleging

excessive use of force is entitled to nominal damages even if he fails to present

evidence of compensable injury." *Slicker v. Jackson*, 215 F.3d 1225, 1231–32 (11th

Cir. 2000). In any case, Percival attributes her injuries to her arrest. *See* Percival

Dep. at 128:10–22.[6]

---

[6] In their reply, the Sheriff Defendants argue that they are entitled to summary judgment on
causation and damages because Percival fails to present any expert testimony on causation. Reply
(Doc. 132) at 5. Because a "party cannot raise new arguments in support of summary judgment for

For these reasons, the deputies are not entitled to summary judgment on Count III.

### v. Count IV: False Arrest

"To succeed on a false-arrest claim, a plaintiff must establish (1) a lack of probable cause and (2) an arrest." *Brooks v. Miller*, 78 F.4th 1267, 1281 (11th Cir. 2023). Percival argues that the deputies violated the Fourth Amendment when they arrested her without a warrant and probable cause. Second Am. Compl. ¶¶ 145–50. Because the deputies had probable cause to arrest Percival, *supra* at 25–30, they are entitled to qualified immunity and summary judgment on Count IV.

### vi. Count V: Malicious Prosecution

To prevail on her malicious prosecution claim under § 1983, Percival must prove the common law elements of malicious prosecution,[7] and "that the [deputies] violated [her] Fourth Amendment right to be free from seizures pursuant to legal

---

the first time in a reply brief," *Starbuck v. R.J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223, 1229 (M.D. Fla. 2018), I do not consider this argument.

[7] "The constituent elements of the common law tort of malicious prosecution include: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023) (alterations omitted) (quotations omitted).

process." *Luke v. Gulley* (*Luke II*), 50 F.4th 90, 95 (11th Cir. 2022) (per curiam) (quoting *Luke v. Gulley* (*Luke I*), 975 F.3d 1140, 1143 (11th Cir. 2020)). With respect to the Fourth Amendment, Percival must provide "proof that 'the legal process justifying [her] seizure was constitutionally infirm' and that '[her] seizure would not otherwise be justified without legal process.'" *Id.* (quoting *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir. 2020)).

Although somewhat unclear, it appears that Percival relies on her warrantless arrest as the predicate seizure for her malicious prosecution claim. This is the only seizure she identifies in her complaint. *See* Second Am. Compl. ¶¶ 117–24. To the extent Percival can rely on this warrantless seizure in bringing a malicious prosecution claim,[8] the seizure was supported by probable cause and thus the deputies are entitled to qualified immunity and summary judgment on Count V. *See supra* at 25–30; *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010).

---

[8] Under Eleventh Circuit precedent, warrantless seizures do not provide a basis for a malicious prosecution claim, which requires a seizure 'pursuant to legal process.'" *Williams*, 965 F.3d at 1158 (quoting *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016)). This difference between false arrest and malicious prosecution claims affects how the Eleventh Circuit views the factual record for the purposes of assessing probable cause. *See Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1330 (11th Cir. 2024). The parties did not recognize this difference in their briefing. In any case, because Percival apparently predicates both her false arrest and malicious prosecution claims on the same seizure, probable cause for that seizure justifies granting the deputies summary judgment on Count V.

38

## 2.  State Claims

Percival pleads five state law claims against the deputies in their individual capacities. *See* Second Am. Compl. ¶¶ 159–66 (Count VI–Malicious Prosecution); *id.* ¶¶ 167–71 (Count VII–Battery); *id.* ¶¶ 177–84 (Count IX–Trespass to Land); *id.* ¶¶ 191–97 (Count XI–False Imprisonment/Arrest); *id.* ¶¶ 203–08 (Count XIII–Illegal Search of Home).

### i.  Statutory Immunity

The deputies argue that they are immune from all five state law claims. MSJ at 16–18, 19, 23–30. This argument is governed by § 768.28(9)(a), Florida Statutes,[9] which immunizes the deputies unless they "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."

Section 768.28 also contains a presuit notice requirement. *See* § 768.28(6)(a), Fla. Stat. Although the deputies argue that they are entitled to summary judgment as to all of Percival's state law claims because she failed to comply with the notice requirement, MSJ at 11, § 768.28(6)(a)'s notice requirement does not apply to

---

[9] Qualified immunity does not serve as a defense to claims governed by Florida law. *See D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995) ("[Q]ualified immunity is a defense only to federal claims.").

claims against officers in their individual capacities, *see Lundgren v. McDaniel*, 814 F.2d 600, 605 (11th Cir. 1987); *Medberry v. McCallister*, 937 So. 2d 808, 813 (Fla. 1st DCA 2006). Therefore, the deputies are not entitled to summary judgment on this basis.

### ii. Count VI: Malicious Prosecution

Percival's first state law claim is for malicious prosecution. Second Am. Compl. ¶¶ 159–66. In Florida, one element of a malicious prosecution claim is that "there was an absence of probable cause for the original proceeding." *MacAlister v. Bevis Const., Inc.*, 164 So. 3d 773, 777 (Fla. 2d DCA 2015) (quoting *Olson v. Johnson,* 961 So. 2d 356, 359 (Fla. 2d DCA 2007)).

"[T]he standard for determining the existence of probable cause is the same under both Florida and federal law." *Rankin v. Evans*, 133 F.3d 1425, 1433 (11th Cir. 1998). Because the deputies had probable cause to arrest Percival, *see supra* at 25–30, they are entitled to summary judgment on Count VI. *See, e.g., Daniel v. Vill. of Royal Palm Beach*, 889 So. 2d 988, 990 (Fla. 4th DCA 2004).[10]

---

[10] This assumes, of course, that Percival could bring this claim against the deputies under § 768.28(9)(a), Florida Statutes. I need not pass on that question because Percival's claim fails on the merits.

### iii. Count VII: Battery

Under Florida law, "[b]attery consists of the infliction of a harmful or
offensive contact upon another with the intent to cause such contact or the
apprehension that such contact is imminent." *Quilling v. Price*, 894 So. 2d 1061,
1063 (Fla. 5th DCA 2005). Percival's claim is predicated on the same conduct as her
federal excessive force claim: the deputies allegedly sweeping Percival's leg out from
under her, slamming her to the ground, and using their knees to pin her against the
ground. Second Am. Compl. ¶ 168. The deputies argue that they are entitled to
summary judgment because: (1) "an alleged battery committed incident to arrest
does not give rise to an independent tort in Florida"; (2) they did not employ
excessive force; and (3) they did not act "in bad faith or with malicious purpose or in
a manner exhibiting wanton and willful disregard of human rights, safety, or
property," § 768.28(9)(a). MSJ at 27–29. The deputies are not entitled to summary
judgment.

First, although "ordinary incidents of the arrest . . . do not give rise" to a
battery claim, *Lester v. City of Tavares*, 603 So. 2d 18, 19–20 (Fla. 5th DCA 1992),
a "police officer may be liable for the use of excessive force (i.e., battery) while
effectuating a lawful arrest," *Kimbrel v. Clark*, 385 So. 3d 1124, 1128 (Fla. 1st DCA

41

2024). Second, even though Florida law afforded the deputies "a presumption of good faith . . . as to the use of force applied during a lawful arrest," *id.*, I have already explained why, when viewing the facts in the light most favorable to Percival, a jury could conclude that "the amount of force used was [un]reasonable under the circumstances," *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996); *see supra* at 32–37. Third, a reasonable jury could conclude that the deputies, in battering Percival, "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." § 768.28(9)(a), Fla. Stat.; *see Gualtieri v. Bogle*, 343 So. 3d 1267, 1273–74 (Fla. 2d DCA 2022). A jury must decide these contested questions of fact based on the credibility of the witnesses. Therefore, the deputies are not entitled to summary judgment on Count VII.

### iv. Count IX: Trespass to Land

Under Florida law, "[t]respass to real property is the unauthorized entry onto another's real property." *Daniel v. Morris*, 181 So. 3d 1195, 1199 (Fla. 5th DCA 2015). "Consent is an absolute defense to an action for trespass." *Pearson v. Ford Motor Co.*, 694 So. 2d 61, 69 (Fla. 1st DCA 1997). Also, a police officer has the "right" to "enter upon private property" when "sufficient exigent circumstances"

exist. *Guin v. City of Riviera Beach*, 388 So. 2d 604, 606 (Fla. 4th DCA 1980); *see Potts v. Johnson*, 654 So. 2d 596, 599 (Fla. 3d DCA 1995). Whether the facts are sufficient "to constitute exigent circumstances" is a legal question. *Guin*, 388 So. 2d at 606.

Percival argues that the deputies trespassed when they intentionally and unlawfully entered her home without consent. Second Am. Compl. ¶ 178. She also argues that the deputies "acted in bad faith, with willful and wanton conduct, and with malicious purpose when they chose to enter Ms. Percival's home, physically abuse her, and arrest Ms. Percival despite knowing they had no legal basis to do so." *Id.* ¶ 182. The deputies respond that: (1) they are entitled to immunity under § 768.28(9)(a); (2) Leduc consented to their entry of the home; and (3) an immediate need for police assistance justified their entry. MSJ at 12–16, 30–31, *see id.* at 28–29.

In the light of the disputed facts, the deputies are not entitled to immunity under § 768.28(9)(a). If a jury believes Percival that the deputies entered her home, and battered her without justification, then the jury could find that the deputies trespassed "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." § 768.28(9)(a), Fla. Stat.

43

As for consent, the parties appear to assume that the Fourth Amendment shapes Florida's standard. *See* MSJ at 12–14, 30–31; Resp. at 14–15, 29. Because the parties have not briefed whether a different standard applies under Florida tort law, I assume without deciding that cases interpreting the Fourth Amendment are informative in determining whether the deputies entered the home with consent. *See* MTD Order at 19 (making the same assumption). Applying Fourth Amendment principles, the deputies are not entitled to summary judgment.

For reasons I have already explained, after *Randolph*, Leduc's consent does not justify entry. *See supra* at 21–22. To be sure, in dicta the Supreme Court distinguished between entry for the purposes of "trespass" law and entry for the purposes of "search[ing] for evidence," *id.* at 118, but the deputies do not point to a source of Florida law that rejects *Randolph*'s holding in this context.

In any case, even if *Randolph* does not apply, the deputies must show that Leduc's consent authorized their entry. A "third party who possesses common authority over the premises" may consent to its search. *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990). Common authority is "not to be implied from the mere property interest a third party has in the property," but "rests rather on mutual use of the property by persons generally having joint access or control for most purposes."

*United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). Factually deficient consent can justify entry, but law enforcement must reasonably believe that the consenting party is "a resident of the premises." *Rodriguez*, 497 U.S. at 186. This zone of reasonable belief is not unlimited: "Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Id.* at 188. The "determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Id.* (cleaned up).

The deputies argue that their belief was objectively reasonable because: (1) Leduc told them that he lived at Percival's home and maintained personal and business items there and (2) Percival did not initially deny that Leduc was a personal resident at her home. MSJ at 13; *see, e.g.*, Perera Dep. at 22:7–23:1; 27:11–14; 28:2–5; 36:2–10; 38:8–10, 70:7–18; Brizendine Dep. at 32:11–17; 44:24–45:1. But Percival denies telling any of the deputies that Leduc lived at her home, and she was adamant on the date of entry that Leduc never resided there. Percival Dep. at 59:9–23; Perera Dep. at 47:1–7; Brizendine Dep. at 32:18–33:3. Also, before entry, Leduc

45

did not provide any evidence supporting his claim to living in Percival's home. *See*
Perera Dep. at 47:22–48:5. Leduc did not have a key to the home, and Leduc's
driver's license, which Perera reviewed, listed another address. *See id.* at 35:1–17,
36:11–18. Even with these disparities, Perera never sought additional evidence
supporting Leduc's claim. *Id.* at 47:8–15. Brizendine did not seek any confirmatory
evidence either, instead relying solely on the word of Leduc and Perera. Brizendine
Dep. at 31:20–32:16. Even though Leduc appears to have left property in Percival's
home, *see* Perera Dep. at 28:6–19; Brizendine Dep. at 41:6–11, the deputies did not
know see that evidence at the time they decided to enter and therefore it cannot
retroactively justify their entry, *cf. Williams v. State*, 788 So. 2d 334, 336 (Fla. 5th
DCA 2001) ("A warrantless entry is valid when based on the consent of a third party
whom police, *at the time of entry*, reasonably believe possesses common authority
over the premises, but who in fact does not possess such authority." (emphasis
added)).

In sum, even assuming Leduc's consent could provide a basis for entry, given
the genuine dispute about whether Percival told Perera that Leduc lived there,
Percival's adamance on the date of entry that Leduc did not reside at the home, and

the lack of any evidence as to Leduc's residence other than Leduc's word, the deputies are not entitled to summary judgment based on Leduc's consent to entry.

The deputies also assume that Fourth Amendment case law informs the exigency standard under Florida tort law. MSJ at 14–16, 30–31. From my review, there does not appear to be much of a disparity. *Compare Webster v. State*, 201 So. 2d 789, 792 (Fla. 4th DCA 1967) ("[T]he criterion is the reasonableness of the belief of the police as to the existence of an emergency."), *with Evans*, 958 F.3d at 1106 (describing the federal rule as "whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger" (quoting *Fisher*, 558 U.S. at 49)). Therefore, I conclude that no "exigent circumstance" supported the deputies' entry. *See supra* at 18–21. I also note that allowing the deputies to base their entry on Percival's refusal to authorize Leduc's entry would have the effect of eroding Percival's property rights. *Cf. Lapace v. State*, 257 So. 3d 588, 596 (Fla. 2d DCA 2018) ("Ms. Lawson's reaction to the deputies' presence at her home, together with her unwillingness to allow the deputies into the house, cannot satisfy the requisite showing of an objective belief that there was an ongoing emergency that required the immediate attention of the police.").

47

For these reasons, I conclude that the deputies are not entitled to summary judgment on Count IX.

### v. Count XI: False Imprisonment/False Arrest

The Eleventh Circuit has "held that 'under Florida law false arrest and false imprisonment are different labels for the same cause of action.'" *Coleman v. Hillsborough County*, 41 F.4th 1319, 1327 (11th Cir. 2022) (quoting *Rankin*, 133 F.3d at 1430 n.5). Probable cause serves as a defense. *See Ford v. City of Boynton Beach*, 323 So. 3d 215, 219 (Fla. 4th DCA 2021); *Kimbrel*, 385 So. 3d at 1127. Percival alleges that the deputies committed this tort when they restrained her inside her home and then arrested her. Second Am. Compl. ¶ 192. Because the deputies' actions to restrain and arrest Percival were supported by probable cause, *see supra* at 25–30, the deputies are entitled to summary judgment as to Count XI.

### vi. Count XIII: Illegal Search of Home

Florida courts have recognized the "tort of invasion of privacy" when a defendant intrudes "upon the plaintiff's physical solitude or seclusion, as by invading his home." *Guin*, 388 So. 2d at 606 (quotation omitted). The invasion must, as an objective matter, "go beyond all possible bounds of decency." *Stoddard v. Wohlfahrt*, 573 So. 2d 1060, 1062 (Fla. 5th DCA 1991) (quoting *Ponton v. Scarfone*, 468 So.

48

2d 1009, 1011 (Fla. 2d DCA 1985)). The invasion tort is distinct from the tort of trespass, which a defendant commits by "merely entering a building." *Guin*, 388 So. 2d at 606. Florida courts have held that, in some circumstances, a plaintiff can plead the two torts in the parallel. *See id.*

Percival alleges that the deputies "conducted an illegal search of [her] home when they crossed the threshold of [her] home absent a warrant, consent, probable cause, or warrant exceptions, in violation of [her] rights under Article I, Section 12 of the Florida Constitution." Second Am. Compl. ¶ 205. The deputies raise the same merits arguments as they did with respect to the trespass claim. *See* MSJ at 12–16, 31–32. They also argue that they are entitled to summary judgment because "there is no evidence [they] searched [Percival's] home" and because this claim merges with Percival's trespass claim. *See id.* at 31.

This count is "poorly phrased" and "incorrectly grounds" Percival's claim in the Florida Constitution. MTD Order at 23; *see Depaola v. Town of Davie*, 872 So. 2d 377, 380 (Fla. 4th DCA 2004) ("[N]o cause of action exists for money damages for a violation of a state constitutional right."). Like with the amended complaint, though, I construe Percival's claim as one for an invasion of privacy. *See* MTD Order at 23; Resp. at 27 (relying on *Guin*).

49

For the same reasons as above, I reject the argument that the deputies are entitled to judgment as a matter of law under § 768.28(9)(a), the consent exception, and the exigent circumstances exception. *See supra* at 43–48. On the authority of *Guin*, I also reject the deputies' merger argument. *See* MTD Order at 23–24. Finally, even though the deputies appear not to have "conducted a formal search," *id.* at 24; *see* Percival Dep. at 92:5–7, the record indicates that the deputies walked through Percival's home by following Leduc while he collected his belongings, *see* Brizendine Dep. at 74:21–75:20; Percival Aff. ¶¶ 22–32; *see also* Perera Dep. at 49:20–50:13; Percival Dep. at 92:8–21. In the light of this evidence, the deputies are not entitled to summary judgment on Count XIII. *Cf.* MTD Order at 24.

### B. Percival's Claims against Chronister

Percival pleads four state law counts against Chronister in his official capacity. *See* Second Am. Compl. ¶¶ 172–76 (Count VIII–Battery); *id.* ¶¶ 185–90 (Count X–Trespass to Land); *id.* ¶¶ 198–202 (Count XII–False Imprisonment/Arrest); *id.* ¶¶ 209–14 (Count XIV–State Law Illegal Search). Chronister argues that judgment must be granted in his favor because Percival failed to comply with Florida's presuit notice statute, *see* § 768.28(6)(a), Fla. Stat., and because the claims fail as a matter of law.

### 1. Section 768.28(6)'s Presuit Notice Requirement

Section 768.28, Florida Statutes, governs the extent that "the state[] for itself and for its agencies or subdivisions . . . waives sovereign immunity for liability for torts." § 768.28(1), Fla. Stat. With exceptions not relevant here:

> An action may not be instituted on a claim against the state or one of its agencies or subdivisions unless the claimant presents the claim in writing to the appropriate agency, and also, except as to any claim against a municipality, county, or the Florida Space Authority, presents such claim in writing to the Department of Financial Services, within 3 years after such claim accrues and the Department of Financial Services or the appropriate agency denies the claim in writing.

*Id.* § 768.28(6)(a). In this notice, the claimant must provide, among other things, "the claimant's date and place of birth and social security number if the claimant is an individual, or a federal identification number if the claimant is not an individual." *Id.* § 768.28(6)(c). "[T]he requirements of notice to the agency and denial of the claim pursuant to paragraph (a) are conditions precedent to maintaining an action." *Id.* § 768.28(6)(b). Section 768.28(6)(a)'s language "is clear and must be strictly construed." *Menendez v. N. Broward Hosp. Dist.*, 537 So. 2d 89, 91 (Fla. 1988).

Section 768.28(6) applies to the sheriff "as a separate entity or agency of a political subdivision." *Beard v. Hambrick*, 396 So. 2d 708, 711 (Fla. 1981); *see*

*Stephens v. Geoghegan*, 702 So. 2d 517, 527 (Fla. 2d DCA 1997) ("A suit against a defendant in his official capacity is, in actuality, a suit against the governmental entity which employs him."). Therefore, Percival's burden is to prove that she satisfied § 768.28(6)(a)'s requirements. *See Pirez v. Brescher*, 584 So. 2d 993, 995 (Fla. 1991).

Chronister argues that the notice requirement was not satisfied for three reasons. I disagree with his first two reasons but agree with his last.

First, § 768.28(6)(c) requires a plaintiff to "provide to the agency the claimant's date and place of birth and social security number." Percival's notice omitted her place of birth, and Chronister moves for summary judgment on that basis. *See* (Doc. 116-5) at 3; MSJ at 10. This is not fatal to Percival's claim because the next subsection of § 768.28 provides that a plaintiff's compliance with subsection (6)(c) "shall occur prior to settlement payment, close of discovery or commencement of trial, whichever is sooner." § 768.28(6)(d), Fla. Stat.; *see Williams v. Henderson*, 687 So. 2d 838, 839 (Fla. 2d DCA 1996). Percival provided her place of birth in her deposition. *See* Percival Dep at 11:22–12:12. Therefore, she remedied her omission before the "close of discovery." § 768.28(6)(d).

52

Second, the parties do not dispute that "[o]n June 2, 2021, [Percival], through
a legal assistant in the office of [her] counsel, sent an email to [Chronister]
containing a '§768.28 Notice Letter.'" JSUF ¶ 14; *see* (Doc. 116-5). Despite this
undisputed fact, Chronister argues that a reasonable jury could not find that Percival
met the notice requirement, because "there is no record evidence that Sheriff
Chronister actually received, in hand, the pre-suit notice that was allegedly emailed
to him." MSJ at 11. Chronister relies on *Simmons v. Public Health Trust of Miami-
Dade County*, where the Third District Court of Appeal rejected the application of
the mailbox rule and held that "a claimant 'presents' his notice of claim under section
768.28(6) on the date the state agency or subdivision receives, in hand, the notice of
claim, not on the date that the claimant mails his notice of claim to the agency or
subdivision." 338 So. 3d 1057, 1065 (Fla. 3d DCA 2022). The timeliness of
Percival's notice does not turn on application of the mailbox rule. Indeed, Chronister
agrees that Percival emailed him the notice two years before § 768.28(6)(a)'s
deadline. JSUF ¶ 14. Given that the email is in the record and Chronister provides
no evidence to contest that he received it within § 768.28(6)(a)'s timeline,
Chronister is not entitled to summary judgment on this basis. *Cf. Kennell v. Gates*,
215 F.3d 825, 829 (8th Cir. 2000) ("A jury generally is permitted to infer that

information sent via a reliable means—such as the postal service or a telegram—was received. We see no principled reason why a jury would not be able to make the same inference regarding other forms of communication—such as [e-mail]—provided they are accepted as generally reliable and that the particular message is properly dispatched.").[11]

Chronister's third argument is that he remains immune from suit because Percival failed to notice Florida's Department of Financial Services (DFS). As a condition precedent to initiating an action against the state or one of its agencies or subdivisions, a plaintiff must ordinarily present her claim to the "appropriate agency" and DFS. § 768.28(6)(a), Fla. Stat. A plaintiff is not required to present her claim to DFS, though, when her claim is against "a municipality, county, or the Florida Space Authority." *Id.* So, the question is whether Chronister, as sheriff, qualifies as a "county."

---

[11] In an affidavit, Andrea Macias states that she emailed the notice to Chronister and did not receive "a return email stating that [her] email was not or could not be delivered." Macias Aff. (Doc. 129-3) ¶¶ 6–9. Chronister responds that Percival did not disclose Macias under Rule 26 and thus her affidavit cannot be considered. *See* FED. R. CIV. P. 37(c)(1). Because of my conclusion that Percival failed to comply because she did not serve the Department of Financial Services, I do not address Chronister's contention under Rule 37(c)(1).

The Florida Supreme Court has not yet decided this question. *See SE Prop.*
*Holdings, LLC v. Welch*, 65 F.4th 1335, 1342 (11th Cir. 2023) ("Because we are
interpreting Florida law, we look first for case precedent from Florida's highest
court—the Florida Supreme Court."). In *Beard*, the Florida Supreme Court
concluded that "a sheriff is subject to the provisions of section 768.28 for the
negligence or wrongful act of one of his deputies or employees under circumstances
in which 'a private person would be liable.'" 396 So. 2d at 711–712. In ruling, the
Court described a sheriff as "a county official" and "an integral part of the 'county' as
a 'political subdivision.'" *Id.* This mirrors the Florida Constitution, which includes
a sheriff as a "county officer." FLA. CONST. art. VIII, § 1(d); *see Beard*, 396 So. 2d
at 712 ("In our opinion, there is no reasonable way to construe article VIII, section
1, other than to include sheriffs as well as other named county officers as part of a
county.").

Beard also defined a sheriff as "a separate entity or agency of a political
subdivision." 396 So. 2d at 711. A later decision, which concerned "proper notice"
to a sheriff under § 768.28(6)(a), emphasized this part of *Beard. See Pirez*, 584
So. 2d at 995. In *Pirez*, the question was whether notice to the county attorney
sufficed under § 768.28(6)(a) regarding a claim against the sheriff. *Id.* at 994. The

Florida Supreme Court concluded no: "[t]he county attorney's office does not represent the sheriff," and "therefore, notice to the county attorney is not sufficient under section 768.28(6)(a) when a lawsuit is filed against the sheriff." *Id.* at 995; *see* § 768.28(6)(a), Fla. Stat. (requiring presentation "to the appropriate agency").

Although related, these precedents do not decide the question, so state intermediate appellate decisions provide some guidance. *See Welch*, 65 F.4th at 1342. Most recently, in *Staly v. Izotova*, the Fifth District Court of Appeal concluded that the plaintiff, in a suit against the sheriff, failed to comply with § 768.28(6)(a) because she failed to properly present her claim to both the sheriff and DFS. 403 So. 3d 1034, 1038 (Fla. 5th DCA 2024) (finding that the plaintiff "failed to comply with the statute because she did not serve a notice on the Department of Financial Services."). Although helpful to Chronister, *Staly* concerned only whether the plaintiff sufficiently noticed DFS; the court did not address the antecedent question of whether a plaintiff needed to notice DFS when she has a claim against the sheriff.

*Staly*'s result is supported, though, by the principle that § 768.28(6)(a) "must be strictly construed" because it is a waiver of sovereign immunity. *Levine*, 442 So. 2d at 212. The First District Court of Appeal employed this rule of construction in

56

holding that a plaintiff needed to present her claim to DFS's precursor, the Department of Insurance, in a suit against an "agency of a municipality." *McSwain v. Dussia*, 499 So. 2d 868, 870 (Fla. 1st DCA 1986). That court explained that "the statute must be given literal effect" and "only if the claim is against a 'municipality' itself is notice on the Department of Insurance excused." *Id. But cf. Soto v. Franklin Acad. Found., Inc.*, 386 So. 3d 150, 151 (Fla. 4th DCA 2024) (suggesting that in a suit against a " 'county' agency," presentation to DFS is not required); *Lederer v. Orlando Utilities Comm'n*, 981 So. 2d 521, 523 (Fla. 5th DCA 2008) (stating that notice is not required before bringing suit against "a component part of the City, such as its police or fire department").

In the light of strict construction for waivers of sovereign immunity, I conclude that the text of the exception (which specifies a "county," not "county officers" or a "sheriff") and the above Florida caselaw suggest that a plaintiff with a claim against a sheriff must present her claim to the Department of Financial Services under § 768.28(6)(a).[12] Even though DFS may not be involved in suits

---

[12] This is yet another case that proves both litigants and courts "would benefit from amendment to the Florida Constitution to permit federal district courts to certify questions to the Florida Supreme Court." *Emergency Recovery, Inc. v. Gov't Employees Ins. Co.*, 773 F. Supp. 3d 1304, 1315 n.8 (M.D. Fla. 2025).

against sheriffs, the Florida Supreme Court has "strictly construed" this exception, prioritizing adherence to the "plain language of the statute" over consideration of DFS's "intended function" in "the defense" of the suit at hand. *Levine*, 442 So. 2d at 212–213; *accord Metro. Dade Cnty. v. Reyes*, 688 So. 2d 311, 313 (Fla. 1996). In other words, it is for the Florida Legislature to make clear—not the judiciary to divine based on extratextual considerations—whether and when sovereign immunity is abrogated. *See McSwain*, 499 So. 2d at 870.

This result is supported by *Pirez*, which distinguishes between the sheriff and the county on "the issue of proper notice," 584 So. 2d at 995; *see Obremski v. Armor Corr. Health Services, Inc.*, 467 F. Supp. 3d 1265, 1283 n.9 (S.D. Fla. 2020) ("*Pirez*'s central holding [is] that the sheriff is *not* the county." (emphasis added)), and *Staly*, which at least suggests that notice to DFS is needed in this context, *see* 403 So. 3d at 1038. Other pieces of evidence also support a distinction in Florida law between a county and its sheriff. *See, e.g.*, § 30.53, Fla. Stat. (preserving the "independence of the sheriffs" "concerning the purchase and procurement of supplies and equipment, selection of personnel, and the hiring, firing, and setting of salaries of such personnel").

To be sure, not all indicators of the meaning of the exception for "county" point in the same direction. For example, *Beard* defines a sheriff "as an integral part of the 'county.'" 396 So. 2d at 711. And the Florida Supreme Court presumes that the Florida Legislature operates with judicial precedents in mind when enacting subsequent legislation. *See Adler-Built Indus., Inc. v. Metro. Dade Cnty.*, 231 So. 2d 197, 199 (Fla. 1970) ("The Legislature is presumed to be acquainted with judicial decisions on the subject concerning which it subsequently enacts a statute.").

Although perhaps sound policy to exempt notice to DFS which plays no discernable role in paying judgments against a sheriff, that kind of argument is the sort of "speculation" and "consideration" of "efficacy" that the Florida Supreme Court has forsworn in this area. *See Levine*, 442 So. 2d at 212. And although *Beard* is informative, it does not overcome the Florida Supreme Court's strict construal of the notice provision. Because I must answer this question the "the way it appears the [Florida Supreme Court] would," *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001) (quotation omitted), I conclude, based on *Levine* and other precedent strictly construing § 768.28(6)(a), that notice to DFS is required under the statute when suing a sheriff. Because Percival did not provide notice to

59

DFS within three years of her claims' accrual, Chronister's motion for summary judgment is granted. *See Staly*, 403 So. 3d at 1038.

## IV.    CONCLUSION

Accordingly, the following is **ORDERED:**

1.    The Motion for Summary Judgment (Doc. 116) is **GRANTED** as to Counts II, IV, V, VI, VIII, X, XI, XII, and XIV. The Motion for Summary Judgment is otherwise **DENIED**. Counts I, III, VII, IX, and XIII will proceed to trial.

2.    No later than **July 25, 2025**, the parties are directed to file a joint notice of proposed trial dates for the remainder of 2025 and estimate the length of trial.

**ORDERED** in Tampa, Florida, on July 15, 2025.

Kathryn Kimball Mizelle
United States District Judge